## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| EDGARDO ERAZO-VÁZQUEZ,<br><br>**Plaintiffs,**<br><br>v.<br><br>**STATE INDUSTRIAL PRODUCTS CORP., <u>et al.,</u>**<br><br>**Defendants.** | **CIVIL NO. 16-2709 (PAD)** |

## OPINION AND ORDER

Delgado-Hernández, District Judge.

Plaintiff Edgardo Erazo-Vázquez resigned from his employment as a sales representative in the State Chemical organization after the employer restructured its sales operation, assigning territories and modifying the compensation arrangement with sales personnel. Claiming the changes were motivated by age and retaliatory animus and created a hostile work environment that led to his resignation, a resignation that he characterizes as a constructive discharge, he sued State Chemical Sales Company International, Inc. and State Chemical's parent company – State Industrial Products Corporation – complaining of age discrimination, retaliation, unjust discharge, tortious behavior and constitutional violations under Federal and Puerto Rico law.[1] As explained below, some of the claims are time barred; there was no discrimination, hostile work environment or retaliation; the employer acted with legitimate, nondiscriminatory grounds in restructuring its

---

[1] As to Federal law, the Age Discrimination in Employment Act, 29 U.S.C. § 621 <u>et seq.</u> ("ADEA") (discrimination and retaliation); regarding Puerto Rico law, Law 100 of June 30, 1959, P.R. Laws Ann. tit. 29, § 146 <u>et seq.</u> ("Law 100")(age discrimination), Law 80 of May 30, 1976, P.R. Laws Ann. tit. 29, § 185a <u>et seq.</u> ("Law 80")(unjust discharge), Law 115 of December 20, 1991, P.R. Laws Ann. tit. 29, § 194 <u>et seq.</u> ("Law 115") (retaliation); Articles 1802 and 1803 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, §§ 5141 and 5142 (tortious behavior); and Bill of Rights of the Puerto Rico Constitution, P.R. Laws Ann. tit. 1. <u>See</u>, Complaint (Docket No. 1).

sales operations and compensation formula to adjust to changes in the market; and plaintiff was not constructively discharged.[2]  Therefore, the case must be, and is hereby dismissed under Fed. R. Civ. P. 56.  To facilitate review, a table of content is included as Appendix I.

## I.  PROCEDURAL DEVELOPMENTS

On September 23, 2016, plaintiff filed the Complaint (Docket No. 1).  On November 17, 2016, State Chemical answered the Complaint (Docket No. 13).  On July 14, 2017, State Industrial answered the Complaint (Docket No. 48).  After a contested discovery period, State Chemical and State Industrial moved for summary judgment (Docket Nos. 161 and 163), which plaintiff opposed (Docket Nos. 178 and 180).  State Chemical and State Industrial replied (Docket Nos. 186 and 190), and plaintiff sur-replied (Docket No. 206).  Meanwhile, on November 30, 2018, State Industrial and State Chemical moved for sanctions under Fed.R.Civ.P. 11 (Docket No. 200), and on December 28, 2018 asked the court to strike the sur-reply (Docket No. 208), both of which motions plaintiff opposed (Docket Nos. 210 and 213).  On March 31, 2019, the court granted defendants' motions for summary judgment and denied the motions for sanctions and to strike plaintiff's sur-reply (Docket No. 229).

In the process of preparing the corresponding Opinion and Order, the court stayed the case because the plaintiff in the Companion Case, a former sales representative like plaintiff in the State Chemical organization with similar claims against the same defendants here, had appealed to the First Circuit the entry of summary judgment against him (Docket No. 233).  Along that line, the

---

[2]  A sister court in this District entered summary judgment dismissing similar claims by another former sales representative of the State Chemical organization – see, González-López v. State Industrial Products Corp. and State Chemical Sales Company International, Inc. et al., 2019 WL 8370884 (D.P.R. Mar. 20, 2019) – a ruling which the First Circuit affirmed.  See, González-López v. State Industrial Products Corp. and State Chemical Sales Company International, Inc. No. 19-1439 (Nov. 10, 2020).  The First Circuit's ruling is included in Appendix II.  This parallel litigation will be referred to as the "Companion Case."

court referred this case to mediation pursuant to the Civil Appeals Management Program, ordering the parties to appear before the First Circuit's settlement office (Docket No. 231).  But no settlement was reached.  And on November 10, 2020, the First Circuit affirmed the sister court's decision, entering judgment the same day.  That being so, the stay is lifted.  With the benefit of the First Circuit's decision, following are the grounds in support of summary judgment here.

## II.  <u>SUMMARY JUDGMENT STANDARD</u>

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  A factual dispute is genuine "if the evidence is such that a reasonable jury could returned a verdict for the nonmoving party." <u>Anderson</u> v. <u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  It is "material" if it potentially affects the outcome of the suit under governing law. <u>Id.</u>

All reasonable factual inferences must be drawn in favor of the party against whom summary judgment is sought. <u>See</u>, <u>Shafmaster</u> v. <u>U.S.</u>, 707 F.3d 130, 135 (1st Cir. 2013)(so noting).  To resist summary judgment, however, the nonmovant must do more than show some metaphysical doubt as to a material fact. <u>See</u>, <u>Matsushita Elec. Indus. Co., Ltd.</u> v. <u>Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986)(articulating proposition).  Conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative, do "not suffice to ward off a properly supported summary judgment motion." <u>Nieves-Romero</u> v. <u>U.S.</u>, 715 F.3d 375, 378 (1st Cir. 2013).

Erazo-Vázquez v. State Industrial Products Corp., et al.
Civil No. 16-2709
Opinion and Order
Page 4 of 59

## III.  FINDINGS OF FACT[3]

### A.  The Parties

Plaintiff was born on September 6, 1956.  See, Docket No. 161-1, ¶ 11; Docket No. 180-1, ¶ 11.  He began working as a sales representative at State Chemical on November 23, 1987.  See, Docket No. 161-1, ¶ 2.  He resigned in May 2015.  Id. at ¶ 10.[4]  State Chemical is a subsidiary of State Industrial.  Id. at ¶ 1.[5]  State Industrial manufactures and sells industrial maintenance and specialty chemical products.  Id.  State Chemical sells State Industrial's products in Puerto Rico.  Id.

### B.  Compensation

State Chemical sales representatives are paid on a salary or straight commission basis.  See, SUMF (Docket No. 161-1) ¶ 5.[6]  Salaried representatives receive a basic salary of $25,000 per year, monthly bonuses of 5% commissions subject to the representative's meeting established

---

[3] The facts included in this section are drawn from the parties' Local Rule 56 submissions (Docket Nos. 161-1, 180-1, 195).  Local Civil Rule 56 is designed to "relieve the district court of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute." CMI Capital Market Investment, LLC v. González-Toro, 520 F.3d 58, 62 (1st Cir. 2008).  In this manner, it requires a party moving for summary judgment to accompany its motion with a brief statement of facts, set forth in numbered paragraphs and supported by specific citations to the record, that the movant contends are uncontested and material.  See, Local Civil Rule 56(b) (laying down requirement).  The opposing party must admit, deny, or qualify those facts, with record support, paragraph by paragraph, and may present, in a separate section, additional facts, set forth in separate numbered paragraphs.  See, Local Rule 56(c) (describing procedure).  If a party improperly controverts adequately supported factual statements, the court may treat those facts as uncontroverted.  See, Natal Pérez v. Oriental Bank & Trust, 291 F.Supp.3d 215, 219 (D.P.R. 2018) (examining proposition).

[4] Summary judgment submissions refer to sales representatives as "sales representatives," "sales reps.," "reps." and "account managers."  For ease of reference the court will use the term "sales representative."

[5] State Industrial is an umbrella under which different corporations, including State Chemical, operate.  See, Docket No. 182-3, p. 6.  Plaintiff alleges that he was an employee of both State Chemical and State Industrial, an allegation that State Industrial denies.  The point is addressed below in connection with State Industrial's motion for summary judgment, which plaintiff opposed.

[6] Plaintiff denies this statement, claiming that employees could be paid on a straight commission basis or receive a salary arrangement that included monthly expense reimbursements, as well as eligibility to receive bonuses, paid vacations, and participation in State Industrial's benefit programs.  The assertion does not deny the statement.  As explained in the text, each payment formula has different components.

Erazo-Vázquez v. State Industrial Products Corp., et al.
Civil No. 16-2709
Opinion and Order
Page 5 of 59

monthly goals, vacations, expense reimbursements, and participation in benefit plans.  See, Docket No. 180-1, ¶ 5; Docket No. 173-9, pp. 1-2.  Commission payments are based on the volume of sales and whether clients are given a discount.  See, Docket No. 186-1, ¶ 216.  Plaintiff was paid on a commission basis.  See, Docket No. 180-1, ¶ 215; Docket No. 186-1, ¶ 215.[7]  Under that arrangement, he also received expense reimbursements, vacations, and fringe benefits.  See, Docket No. 161-27, p. 26.  In a letter dated March 11, 2013, he was offered the option of being compensated on a salary-basis.  See, Docket No. 161-1, ¶ 6; Docket No. 180-1, ¶ 6; Docket No. 173-1, pp. 1-2.  But he did not accept this offer because for him, being paid on commissions was more beneficial than being paid on salary.  See, Docket No. 161-1, ¶ 7; Docket No. 180-1, ¶ 8.

## C.  Holiday Pay

State Chemical sales representatives do not receive holiday pay.  See, Docket No. 161-1, ¶ 53; Docket No. 180-1, ¶ 53.  In 2012, however, the Company mistakenly made a holiday payment to commissioned salespersons, including plaintiff, based on some wording included in the Sales Associate Handbook.  See, Docket No. 161-1, ¶ 50.[8]  On January 31, 2013, State Chemical sent plaintiff a letter informing him of the error and that the Company was suspending the validity of any Employee Handbook containing the provision on holiday pay.  See, Docket No. 161-1, ¶ 51; Docket No. 180-1, ¶ 51; Docket No. 161-22, p. 1.  The Sales Associate Handbook was changed

---

[7] At the beginning of his employment in 1987 he received a draw until he eased into full commissions.  See, Docket No. 182-6, p. 11.

[8] Plaintiff denies this statement, arguing that the employee handbook contained a valid policy providing for holiday payments to commissioned sales representatives.  See, Docket No. 180-1, ¶ 50.  However, he cites to evidence that supports the statement that the payment was a mistake resulting from an error in the Handbook.  See, Docket No. 161-22, p. 1.

Erazo-Vázquez v. State Industrial Products Corp., *et al.*
Civil No. 16-2709
Opinion and Order
Page 6 of 59

accordingly in 2013.  See, Docket No. 161-1) ¶ 52.[9]  Since then, no State Chemical employee

receives holiday pay.  See, Docket No. 161-1, ¶ 53; Docket No. 180-1, ¶ 53.

### D. **Caribbean Cinemas Account**

One of plaintiff's accounts was that of Caribbean Cinemas, which he handled for about 26

years.  See, Docket No. 180-1, ¶ 157; Docket No. 186-1, ¶ 157.  Around 2012, another company

– Ecolab – offered Caribbean Cinemas its services.  See, Docket No. 180-1, ¶ 158; Docket No.

186-1, ¶ 158.  Because State Chemical was about to lose the account to the competitor, to retain

the account it had to lower its prices.  See, Docket No. 195, ¶ 159.  So, it entered into a negotiation

process with Caribbean Cinemas, which culminated in an agreement in August 2012, by which

State Chemical offered its products at reduced prices; gave Caribbean Cinemas a $20,000.00

credit; and assigned two technicians to serve Caribbean Cinemas' locations.  See, Docket No. 180-

1, ¶¶ 160, 162; Docket No. 186-1, ¶¶ 160; 162; Docket No. 173-1, p. 1; Docket No. 195-6, p. 18.

At the same time, it added ten more products to the account, that is, products that Caribbean

Cinemas had not been buying prior to the agreement.  See, Docket No. 195-6, p. 13.

The strategy was successful, leading to retention of the account to the benefit of both

plaintiff and State Chemical, albeit the discount carried a reduction in plaintiff's commission rate.

See, Docket No. 180-1, ¶ 175; Docket No. 186-1, ¶ 175.  Prior to the adjustment, depending on

the product, plaintiff received a 20% or 25% commission.  See, Docket No. 195-6, p. 12.  With

the adjustment, he received a 16% commission for sales on all products regardless of discounts

plus 4% of reimbursable expenses based on the billing, an arrangement with which plaintiff agreed.

---

[9] Plaintiff denies this statement, stating that he received a letter regarding the holiday pay issue and that the Handbook was amended in February 2015.  See, Docket No. 180-1, ¶ 52.  The denial does not negate the fact that no one received holiday pay after 2012.

See, Docket No. 195, ¶ 173; Docket No. 173-9, p. 1.  In January 2013, the Company informed plaintiff of the new arrangement, confirming it in writing on March 11, 2013.  See, Docket No. 173-9, p. 1.[10]  Overall, plaintiff's total compensation in 2012 was $54, 023; in 2013, $58,385; and in 2014, $58, 093.  See, Docket No. 161-27, p. 26.  Even though, as mentioned earlier, he resigned in May 2015, his annualized compensation for that year was $77, 760.  Id.[11]

### E. Assigned Sales Territory ("AST") Program

#### 1. Program Announcement

In April 2013, State Chemical made a presentation to its sales force entitled "The Future of State."  See, Docket No. 161-1, ¶ 17; Docket No. 180-1, ¶ 17.  During that presentation, the Company expressed that it wanted to focus on key client accounts that purchased more than $2,500 a year by establishing relationships with decision-makers at client companies and offering price protection agreements.  See, Docket No. 161-1, ¶ 18; Docket No. 180-1, ¶ 18.  Historically, State Chemical's point of sale was with the client representative who would use the product, like someone in maintenance or housekeeping departments.  See, Docket No. 161-1, ¶ 19.  State Chemical realized that businesses had changed, and now purchasing departments would control the costs such that decisions were being made at a higher level, as in the case of a director of

---

[10] On January 3, 2013, plaintiff filed an age discrimination claim with the Antidiscrimination Unit of the Puerto Rico Department of Labor and Human Resources ("ADU") against State Chemical and State Industrial because, among other things, of the employer's decision to lower product prices for Caribbean Cinemas.  See, Docket No. 161-1, ¶¶82, 83; Docket No. 180-1, ¶¶ 82, 83.  On April 30, 2013, he voluntarily withdrew the claim.  See, Docket No. 161-1, ¶ 85.[10]  On May 6, 2013, the ADU dismissed plaintiff's charge with prejudice.  See, Docket No. 161-1, ¶ 86; Docket No. 180-1, ¶ 86.  On July 3, 2013, the EEOC withdrew plaintiff's discrimination charge pursuant to plaintiff's request.  See, Docket No. 161-1, ¶ 87; Docket No. 180-1, ¶ 87.  While plaintiff alleges that he was "pressured and forced" to withdraw the claim -see, Docket No. 180-1, ¶ 85, the evidence cited supports the conclusion that the claim was voluntarily dismissed.  See, Docket No. 161-3, pp. 14-15.  At the time, plaintiff was represented by counsel.  See, Docket No. 161-3, p. 15; Docket No. 182-6, p. 21.

[11] At some point after the negotiation with Caribbean Cinemas, because of cost, State Chemical terminated the technicians that had serviced Caribbean Cinemas.  See, Docket No. 180-1, ¶ 166; Docket No. 186-1, ¶ 166; Docket No. 195, ¶ 165.  The terminated technicians had serviced other accounts, not only Caribbean Cinemas, and after their termination, nobody in the Company had service technicians for account support.  See, Docket No. 195, ¶ 165.

operations or of purchasing.  Id.  Thus, State Chemical reasoned that it had to adapt its business mode, looking at a different way of doing business in Puerto Rico.  See, Docket No. 161-1, ¶ 20; Docket No. 161-5, p. 3.

With this in mind, State Chemical pointed out that it was in the process of developing an AST (assigned sales territory) Program for Puerto Rico, which would divide the island into sales territories.  See, Docket No. 161-1) ¶ 22.[12]  At that point, Puerto Rico was an open territory.  See, Docket No. 182-3, p. 11.  Sales representatives could sell to any potential customer, not only to existing customers unless he was the owner of the account.  Id. at 10, 21.  Yet representatives were crossing each other in the field and were not developing enough business in some areas of the Island.  Id. at p. 41. In consequence, the Company decided to spread the business, to get more share out of the market.  Id.  Under the Program, some sales representatives would be assigned a territory and could sell to new clients, not to accounts served by other representatives, and to inactive accounts not included in funnel reports.  See, Docket No. 161-1, ¶ 29; Docket No. 180-1, ¶ 29.[13]  Those without a territory would be allowed to sell to their existing accounts, not to prospective clients, unless they had identified those prospects in a funnel report, or the prospects came by way of a client referral and the Company approved them.  See, Docket No. 182-3, pp. 19-20.

---

[12] Plaintiff denies this statement, stating that he was not informed at the Future of State meeting that the Company would establish territories in the future (Docket No. 180-1, p. 16).  But the evidence cited, to wit, plaintiff's own testimony, supports the contention that plaintiff was aware that Puerto Rico would be divided into territories.  See, Docket No. 182-6, pp. 5-6 (heard from management that Puerto Rico would be divided into territories), and p. 7 (heard from Mr. Seth Urman in a meeting about implementation of territories).

[13] This program had already been implemented in the continental United States and Canada.  See, Docket No. 161-1, ¶ 28; Docket No. 180-1, ¶ 28.

Erazo-Vázquez v. State Industrial Products Corp., et al.
Civil No. 16-2709
Opinion and Order
Page 9 of 59

In November 2013, State Chemical's upper management met to evaluate territory assignments.  See, Docket No. 182-29, p. 9.  Participants included State Chemical's Vice President, Paul Chatterton (Docket No. 195-14, p. 22), State Chemical's Busines Development Manager, Jeffrey Geffert (Docket No. 182-29, p. 15); and State Chemical's Sales Managers, Mario Carrero, Tomás Vélez and Gerardo Maldonado (Docket No. 182-3, pp. 2-3).  See, Docket No. 182-29, pp. 3-5; Docket No. 182-3, p. 16.  One of the criteria they considered for determining who would receive a territory was whether the sales professional had exhibited skills opening new business and a desire to expand the assigned territory.  See, Docket No. 180-1, ¶ 100; Docket No. 186-1, ¶ 100.

To this end, the evaluation team analyzed and discussed the sales data, including total sales, the number of active accounts, new accounts, reactivated accounts, and rolling 12-month sales to new accounts, as in the Company's estimation those numbers had a strong correlation to success in opening new business and growing a territory.  See, Docket No. 182-29, pp. 5-9.  Mr. Chatterton made the ultimate decision.  Id. at pp. 4-5.  The final assignments were made in March 2014, prior to launching the program.  See, 182-29, p. 9.  Age was not considered in the assignment of the territories.  See, Docket No. 195-14, p. 13; Docket No. 182-29, p. 11

## 2.  Program Implementation

In April 2014, State Chemical announced the official implementation of the AST program and the sales representatives who had been selected for territory assignment.  See, Docket No. 161-1, ¶ 31; Docket No. 180-1, ¶ 31; Docket No. 180-1, ¶ 70; Docket No. 186-1, ¶ 70.  In this way, Puerto Rico was divided into 17 territories.  Sales representatives were assigned to ten of the territories, whereas seven territories were kept open for new employees to be hired.  See, Docket No. 182-3, pp. 31-32.  At that time, the Company employed 20 sales representatives.  See, Docket

No. 161-1, ¶ 33.  Of those representatives, ten were assigned a territory.  Id. at ¶ 34.  Five of these representatives were over 40 years of age.  See, Docket No. 161-1, ¶ 34; Docket No. 180-1, ¶ 34; Docket No. 180-1, ¶ 75; Docket No. 186-1, ¶ 75.  Nine of the ten representatives without a territory were at least 40 years of age.  See, Docket No. 180-1, ¶ 80-81; Docket No. 186-1, ¶ 81.

Plaintiff was not assigned a territory, although he had previously expressed interest in being assigned to the Bayamón territory.  See, Docket No. 180-1, ¶¶ 64 & 75; Docket No. 186-1, ¶¶ 64 & 75.[14]  As for his numbers, in 2005 and 2014, respectively, Caribbean Cinemas sales represented 36% and 79% of his total sales (Docket No. 161-27, p. 25).  Given that the sales appeared driven by a single account, the Company believed he did not have the skill set to hunt down new business in a territory utilizing newly adopted sales tools and technology.  See, Docket No. 195-14, p. 10.  For the same reason, it felt that plaintiff would best be served and be most successful continuing the course of business, what he was doing before, not having a sales territory.  See, Docket No. 182-29, p. 11.  Thus, it gave him space to keep that business going.  See, Docket No. 182-3, p. 25.[15]

## F.  2014 AST Handbook: Open Bucket Policy

With the AST Program, State Chemical adopted the "Assigned Sales Territory & Operating Procedures Handbook" ("2014 AST Handbook").  See, Docket No. 161-1, ¶ 36-37; Docket No. 180-1, ¶ 36-37.  Among other things, the 2014 AST Handbook modified the Company's inactive accounts policy.  Inactive accounts are those with less than a $249.99 purchase in a six-month period.  See, Docket No. 173-4, p. 1.  They lose "account ownership" protection and become open

---

[14] Plaintiff felt humiliated over not receiving a territory and complained about it.  See, Docket No. 180-1, ¶¶ 83, 93; Docket No. 186-1, ¶¶ 83, 93.

[15] After the territories were assigned, plaintiff kept his active clients, the ones he had at the time of the assignment.  See, Docket No. 182-7, p. 179.

Erazo-Vázquez v. State Industrial Products Corp., et al.
Civil No. 16-2709
Opinion and Order
Page 11 of 59

accounts, otherwise known as "open bucket" accounts.  See, Docket No. 161-1, ¶ 39.  From 2003

until the policy change, an account fell on open bucket after three months without the minimum

$250 purchase, and anybody could sell on them except Tele-Sales, which had to wait one month

in order to call on the account.  See, Docket No. 173-4, p. 1.

    With implementation of the 2014 AST Handbook, "open bucket" accounts could be

reactivated by: (1) the sales representative previously in charge of the account, provided he had

entered that account as a project in a funnel report by April 15, 2014; (2) the AST Account

Manager in the sales territory where the account was located; and (3) Tele-Sales.  See, Docket No.

161-1, ¶ 40; Docket No. 180-1, ¶ 40.  If an account was in jeopardy of being placed in the Open

Bucket, the sales representative could make an appeal to the District Sales Manager not to place

the account in the Open Bucket.  See, Docket No. 161-1, ¶ 42; Docket No. 180-1, ¶ 42.[16]

### G.  **2015 Handbook**

    On March 31, 2015, State Chemical adopted the "General Operating Procedures

Handbook" of February 2015 ("2015 Handbook").  See, Docket No. 161-1, ¶ 49; Docket No. 180-

1, ¶ 49.  Under the 2015 Handbook, sales representatives without an AST could not sell to "open

bucket" accounts.  See, Docket No. 180-1, ¶ 139; Docket No. 186-1, ¶ 139.  Representatives with

a territory could continue selling to those accounts.  See, Docket No. 180-1, ¶ 144; Docket No.

186-1, ¶ 144.  In addition, all representatives could open new accounts through client referrals.

See, Docket No. 161-21, pp. 1-2; Docket No. 182-3, p. 8.[17]

---

[16] At the end of the day, though, State Chemical understood that it was not economically efficient for sales
representatives to tend to customers that bought less than $250 in a six-month period and believed that, ultimately,
these accounts could be served appropriately by Tele-Sales.  See, Docket No. 161-1, ¶ 41; Docket No. 180-1, ¶ 41.

[17] With this formula, once a client provides the referral, the sales representative takes it to his manager so he could
check if any other representative is working that potential account.  If not, the referral could be worked by the
representative who received the referral and open the account.  Id. at p. 9.

### H.  Contests

State Chemical held two contests during the year for sales representatives.  See, Docket No. 182-9, p. 19.  The contests were structured around opening new accounts and contract business or agreements.  See, Docket No. 195-13, pp. 12-13.  Contract business covered situations where, instead of a sales representative chasing orders each month, he negotiated a contract where money came in automatically for a three or four-year period.  See, Docket No. 195, p. 12; Docket No. 182-29, p. 10.  New accounts could come from prospective clients or client referrals.  All sales representatives were eligible to participate in the contests.  Those without a territory could generate new accounts through client referrals.  See, Docket No. 195-13, p. 15.  And they could secure contract agreements with existing clients.  Id.  Both client referral and contract business counted toward the contests.  Id.

### I.  Field Visits

District Managers accompanied sales representatives on sales calls, in what were commonly known as "field visits."  See, Docket No. 161-1, ¶ 54.  Because new representatives were required to abide by a more demanding training schedule in their first year than later in their careers, District Managers went out with these employees more often.  See, Docket No. 161-1, ¶ 54.  In general terms, District Managers would conduct around twelve to fourteen field visits with a new representative during his first month of employment and, thereafter, a weekly visit for the remainder of the first year.  See, Docket No. 161-1, ¶ 55.  Mr. Geffert indicated that he went out with plaintiff three times prior to the evaluation meeting of November 2013.  See, Docket No. 195-13, p. 4; Docket No. 161-4, p. 18.  Plaintiff claims Geffert only went out with him once.  See, Docket No. 182-10, p. 9.

### J.   Product Samples

State Chemical allows sales representatives to use up to thirty dollars per month in samples for clients.  See, Docket No. 180-1, ¶ 156; Docket No. 186-1, ¶ 156.  If a representative requests samples over that amount, it would be deducted from his commission (in the case of a commission-based representative) or sales bonus (in the case of a salaried representative).  See, Docket No. 189-1, ¶ 8.[18]

### K.   Plaintiff's Resignation

Plaintiff resigned on May 28, 2015.  See, Docket No. 161-1, ¶ 10.[19]  On December 21, 2015, he filed a charge of age discrimination and retaliation against State Chemical and State Industrial with the EEOC (Docket No. 1-1, p. 1).

## IV.   DISCUSSION

### A.  ADEA

#### 1.  Timeliness

State Chemical contends that a number of claims are time-barred because plaintiff did not file a charge with the EEOC within 300 days of each of the events at issue (Docket No. 162, pp. 6-15).  In deferral jurisdictions like Puerto Rico, the ADEA requires aggrieved individuals to file a charge with the EEOC or a state deferral agency "within 300 days" of the employment action

---

[18] Plaintiff believes that new or "younger" people were not charged for samples.  See, Docket No. 182-10, p. 32.  This does not create a genuine issue of material fact, for there is no factual foundation for plaintiff's belief.  He submitted an excerpt of the deposition of Nelson Vázquez, a former State Chemical employee of less than 40 years of age, who stated that his immediate manager – Gerardo Maldonado – gave him extra samples, taking out an "expense" to help him with clients.  See, Docket No. 182-16, pp. 18-19.  He did not, however, explain what an "expense" was and did not deny that he was charged for the extra samples.  He expressed that sales representatives with territories received extra samples because they had more clients.  Id.  Still, that falls flat, as plaintiff does not complain of not receiving extra samples but of being charged for them.

[19] Plaintiff denies this statement, claiming that plaintiff was "wrongfully terminated and/or forced to resign from his job position because of the discriminatory treatment and retaliatory conduct against him became so intolerable and overwhelming that his health was being affected." SUMF ¶ 14.  The denial is not factual, but conclusory and argumentative.

complained of. American Airlines, Inc. v. Cardoza-Rodríguez, 133 F.3d 111, 122 (1st Cir. 1998). As plaintiff filed the EEOC charge in December 2015, he generally cannot claim for employment actions that took place before February 2015. As background, plaintiff complains of: (1) the 2012 renegotiation of the Caribbean Cinemas account, which resulted in a downward commission adjustment for him; (2) elimination of holiday pay in 2012-2013; (3) State Chemical's offering him in 2013, a salary/commission arrangement in lieu of the straight commission arrangement under which he had always worked; (4) the 2014 territory assignments and bucket policy; (5) exclusion from contests; (6) implementation of the 2015 AST Handbook; (7) field visits; and (8) extra product samples (Docket No. 162, pp. 8-9, 14, 19, 26-27).

Along this line, plaintiff charges that after State Chemical renegotiated the agreement with Caribbean Cinemas in 2012, the Company lowered his commission rate and he had to sell more to maintain the same income level (Docket No. 180-1, ¶ 176; Docket No. 161-4, p. 16). He alleges that the employee handbook provided for holiday pay to commissioned sales representatives but that the employer suspended it in 2013. Id. at ¶ 50. He avers that he was not assigned a territory in April of 2014, which according to him, hindered his ability to open new accounts and participate in contests (Docket No. 180, pp. 12-13). He asserts that as a result of the changes to the 2015 AST Handbook, he lost the opportunity to reactivate inactive accounts. Id. at p. 10. He contends that younger employees received preferential treatment, for they were given a basic salary and commissions whereas he had to generate commissions. Id. at p.4. He maintains that even though the employer offered him a salary/commission package, the package did not consider his seniority, as it carried a salary for someone that was just beginning to work in the Company rather than for someone like him, that had been with the organization a number of years (Docket No. 180-1, ¶ 235). Further, he posits that he was discriminated against in connection with field visits and extra

product samples (Docket No. 182-10, pp. 8-9, 31-32).  He submits that he was subjected to a hostile work environment (Docket No. 180, p. 20).   And he states that although he resigned, the resignation should be treated as a constructive discharge (Docket No. 1, ¶ 49).  With the exception of implementation of the 2015 AST Handbook; field visits; extra product samples, hostile work environment and constructive discharge, claims predicated on remaining acts of alleged discrimination are time barred (Docket No. 162, pp. 8-9, 14; 19, 26-27).  See, González-López, 2019 WL 8370884 at *8-*10 (dismissing as time barred in Companion Case, claims based on holiday pay change in 2013, implementation of AST Program in 2014, territory assignments in 2014, and adoption of AST Handbook and open bucket policy in 2014).

Plaintiff alleges that the continuing violation doctrine allows him to bypass the limitations period (Docket No. 180, p. 16; Docket No. 206, p. 7).  Under the continuing violation doctrine, a plaintiff may recover "for discriminatory acts that would otherwise be time-barred so long as a related act fell within the limitations period."  Ayala v. Shinseki, 780 F.3d 52, 57 (1st Cir. 2015). The First Circuit recognizes two kinds of continuing violations, "serial [and] systemic."  Crowley v. L.L. Bean, Inc., 303 F.3d 387, 405 (1st Cir. 2002).  Serial violations comprise "a number of discriminatory acts emanating from the same discriminatory animus," each of which constitutes a separate actionable wrong.  Megwinoff v. Banco Bilbao Vizcaya, 233 F.3d 73, 75 (1st Cir. 2000). A serial violation is continuing "by virtue of the fact that it keeps happening."  Jensen v. Frank, 912 F.2d 517, 522 (1st Cir. 1990).  It contemplates a series of related acts against a single individual.  Id. Systemic violations occur "in the wake of some continuing policy, itself illegal," such that the law does not bar a suit aimed at the employer's dogged insistence upon that policy within the prescribed period."  Thornton v. United Parcel Service, Inc., 587 F.3d 27, 33 (1st Cir. 2009).

Erazo-Vázquez v. State Industrial Products Corp., et al.
Civil No. 16-2709
Opinion and Order
Page 16 of 59

As to serial violations, "discrete discriminatory actions are not actionable if time barred, even when they are related to acts alleged in timely filed charges." Thornton, 587 F.3d at 33 (citing National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002)).  Contrary to events that make up a hostile work environment, discrete acts "occur on a particular day," are easy to identify, and instantaneously actionable.  Ayala, 780 F. 3d at 57.[20]  They form a "separate actionable unlawful employment practice."  Morgan, 536 U.S. at 114.  By its nature, each discrete discriminatory act "starts a new clock for filing charges alleging that act." Id. at 113.  That plaintiff may have continued to feel the effects of a discrete act each day of his employment is of no avail, for "a discrimination claim does not accrue when the plaintiff feels the full effects of the discrimination, but when the discrete act occurs." Dixon v. Hawaii Department of Education, 2018 WL 2207126, * 6 (D.Haw. May 14, 2018).  Thus, merely residual effects of past discriminatory conduct "are not themselves acts of discrimination." Menendez v. Scotiabank of Puerto Rico, Inc., 321 F.Supp.2d 273, 282 (D.P.R. 2004).

Discrete acts include termination, failure to promote, denial of transfer, refusal to hire and events such as those that plaintiff has included in this action.  See, Malghan v. Evans, 118 Fed.Appx. 731, 734 (4th Cir. 2004)(failure to be selected for a position considered discrete act); Gotses v. U.S. Bancorp., 2019 WL 6998670, *5 (C.D. Cal. Nov. 14, 2019)(not being assigned an exclusive territory counted as discrete act); Davis v. Packer Engineering, Inc., 2016 WL 1270425, *6 (N.D. Ill. Mar. 31, 2016)(salary reduction, salary freeze, denial of raise, and denial of bonuses deemed discrete acts); Palmer v. Central Freight Lines, Inc., 2013 WL 1760820, *4 (E.D.Ark. Apr.

---

[20] See, Johnson v. University of Puerto Rico, 714 F.3d 48, 53 (1st Cir. 2013)("Discrete acts and hostile work environment claims are 'different in kind,' because hostile work environment claims by their nature involve repeated conduct and a single act of harassment may not be actionable on its own")(internal citations omitted).

24, 2013)(territory realignment and salary reduction described as discrete acts); <u>Diefenderfer</u> v. <u>Peters</u>, 2009 WL 1884419, *4 (W.D.Wash. Jun. 29, 2009)(constructive discharge adjudged discrete act); <u>Glenn</u> v. <u>Williams</u>, 2006 WL 401816, *17 (D.D.C. Feb. 21, 2006)(assignment resulting in increased workload treated as a discrete act); <u>Quillen</u> v. <u>U.S. Postal Service</u>, 564 F.Supp. 314, 319 (E.D.Mich. 1983)(noting that discontinuance of a particular job assignment is not an act of a continuing nature).[21]  This being so, no liability may be imposed on timeliness grounds under the ADEA for discrete acts occurring before February 24, 2015, comprising claims based on the 2012 Caribbean Cinemas-related downward commission adjustment; the 2012-2013 cutoff of holiday pay; the 2013 offer of a salary/commission arrangement, which plaintiff rejected; and the 2014 territory assignments and directive that sales representatives without territory not open new accounts.

With respect to systemic violations, plaintiff failed to identify a discriminatory policy in effect at times relevant to this action.  His reference to a general plan to replace older employees with new employees, based on the testimony of Daniel Hurst, who worked for the State Chemical organization between 2008 and 2011, is too far removed from the events plaintiff complains about to be considered a policy that justifies bypassing the obligation to file timely charges with the EEOC.  <u>See</u>, <u>Thornton</u>, 587 F.3d at 33 (employer must insist on an illegal policy during prescribed period).  What remains are discrete discriminatory acts.  And "mere series of discriminatory acts motivated by a discriminatory animus" such as plaintiff has alleged does not rise to the level of a

---

[21] <u>See also</u>, <u>Ayala</u>, 780 F.3d at 55, 57 (transferring plaintiff and placing her under the supervision of someone who did not assign her any work considered discrete act); <u>Miller</u> v. <u>New Hampshire Dept. of Corrections</u>, 296 F.3d 18, 21-22 (1st Cir. 2002)(negative performance evaluation, transfer to another area, and letter of warning are discrete acts); <u>Johnson</u> v. <u>McGraw-Hill Companies</u>, 451 F.Supp.2d 681, 692 (W.D. Pa. 2006)(territory realignment viewed as a discrete act); <u>Castro-Medina</u> v. <u>Procter & Gamble Commercial Co.</u>, 565 F.Supp.2d 343, 373 (D.P.R. 2008)(denial of change in territory identified as discrete act); <u>Bailey</u> v. <u>Synthes</u>, 295 F.Supp.2d 344, 353 (S.D.N.Y. 2003)(same with respect to territory reduction).

systemic violation.  Id.[22]  A plaintiff cannot evade statutory time limits merely "by characterizing a completed act of discrimination as a continuing violation."  LaBeach v. Nestle Co., Inc., 658 F.Supp. 676, 687 (S.D.N.Y. 1987).  See, González-López, 2019 WL 8370884 at *8-*10 (rejecting application of continuing violation doctrine in Companion Case).[23]

Plaintiff suggests there is no timeliness problem because to his way of thinking, the employer subjected him to an ongoing pattern and practice of discrimination on the basis of age (Docket No. 1, ¶ 42).  The Supreme Court left open in Morgan the question whether the continuing violation doctrine applies to "pattern or practice" claims.  See, 536 U.S. at 115 n.9 (leaving question open).  But in pattern or practice cases, the plaintiff must "show more than accidental or sporadic incidents of discrimination."  Wittingham v. Amherst College, 164 F.R.D. 124, 126 (D. Mass. 1995)(two individual acts of discrimination are insufficient to establish a practice of discrimination); Ste. Marie v. Eastern R. Ass'n., 650 F.2d 395, 405 (2d Cir. 1981)(seven individual acts of discrimination do not show pattern or practice of discrimination).  Instead, the plaintiff must show that discrimination was the company's standard operation procedure- "the regular rather than the unusual practice."  Wittingham, 164 F.R.D. at 126.  The threshold is crossed when the denial of rights is "repeated," "routine," or "generalized."  International Brotherhood of Teamsters v. U.S., 431 U.S. 324, 396 (1977).  Like the plaintiff in the Companion Case, however, plaintiff failed to present that type of evidence here.  See, González-López, 2019 WL 8370884 at

---

[22] Otherwise, "the distinction between systemic and serial violations could not be maintained."  Megwinoff, 233 F. 3d at 76.

[23] The First Circuit sustained the sister court's ruling, pointing out that "plaintiff's attempt to use the continuing violation doctrine to tie the untimely actions he complains of to the timely actions … is without merit … [for] it is clear … that each of the untimely actions was a discrete action, the consequences of which should have been evident to the plaintiff at the time …".  See, Appendix II, p. 3.

Erazo-Vázquez v. State Industrial Products Corp., et al.
Civil No. 16-2709
Opinion and Order
Page 19 of 59

*7 n.17 (concluding in Companion Case that the plaintiff failed to develop a pattern or practice case of discrimination).[24]  Without a pattern or practice case, claims based on the 2012, 2013, and 2014 discrete acts at issue are untimely.  Correspondingly, as mentioned earlier, the only surviving claims revolve around implementation of the 2015 AST Handbook with the change that it brought about regarding inactive accounts; contests; field visits; extra samples; hostile work environment; and constructive discharge.[25]

## 2. **Disparate Treatment**[26]

### i. **Introduction**

The ADEA "broadly prohibits arbitrary discrimination in the workplace based on age." Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 120 (1985).  To this end, the statute provides in part that "[i]t shall be unlawful for an employer … to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. §

---

[24] Typically, pattern or practice cases "are brought by the government or as a class action."  Díaz v. Ashcroft, 301 F.Supp.2d 112, 116 (D.P.R. 2004).  While the Supreme court has not explicitly held that pattern or practice methods of proof may never be used in private, non-class suits, other courts have reached this conclusion.  (collecting cases). The First Circuit has yet to definitively rule on this issue.  Id.  After Morgan, though, courts have declined to extend the limitations period for discrete acts of discrimination merely because the plaintiff asserts that such discrete acts occurred as part of a pattern or practice of discrimination.  See, Williams v. Giant Food, Inc., 370 F.3d 423, 430 (4th Cir. 2004)("We see no reason why the general rule set out in Morgan should not apply to … separate incidents just because [the plaintiff] alleges, in a general sense, that there was a 'pattern or practice' of discrimination").  At any rate, as noted in the text, plaintiff failed to come up with evidence sufficient to establish a pattern or practice case of discrimination.

[25] Claims based on contests, field visits and extra samples may also be untimely, for those are discrete acts, the consequences of which should have been evident to plaintiff at the time that they occurred.  On this end, plaintiff contends that he lost the opportunity to participate in contests with the assignment of territories (in 2014)(Docket No. 161-4, p. 16); Mr. Geffert's last field visit with plaintiff took place prior to the evaluation meeting (which occurred in November 2013)(Docket No. 195-13, p. 4); and one of plaintiff's witnesses expressed that in April 2014 older employees were not being given extra samples (Docket No. 182-24, ¶ 11).  Nevertheless, for plaintiff's benefit the court will act on the supposition that these items are not untimely and address them on the merits.

[26] ADEA claims may proceed under "disparate treatment" and "disparate impact" theories of employment discrimination.  See, Karlo v. Pittsburgh Glass Works, LLC, 849 F.3d 61, 70 (3d Cir. 2017)(so noting).  The present section examines disparate treatment and a section below evaluates disparate impact.

Erazo-Vázquez v. State Industrial Products Corp., et al.
Civil No. 16-2709
Opinion and Order
Page 20 of 59

623(a)(1).  To establish a disparate-treatment claim under the ADEA, a plaintiff must prove with

direct or indirect evidence, that age was the "but-for" cause of the employer's adverse decision.

Gross v. FBL Financial Services, Inc., 557 U.S. 167, 176 (2009).  Differently stated, the plaintiff's

age must have been the determinative factor as opposed to merely a determinative factor in the

employer's decision.  Id. at 168.  This means that there is "no disparate treatment under the ADEA

when the factor motivating the employer is some feature other than the employee's age."  Bramble

v. American Postal Workers Union, AFL-CIO Providence Local, 135 F.3d 21, 24 (1st Cir. 1998).

### ii.  **Direct Evidence of Discrimination**

Plaintiff alleges that there is direct evidence of age discrimination (Docket No. 180, ¶ 16).

Direct evidence consists of evidence "which, in and of itself, shows a discriminatory animus."

Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 96 (1st Cir. 1996).   It comprises

"statements by a decisionmaker that directly reflect the alleged animus and bear squarely on the

contested employment decision."  Febres v. Challenger Caribbean Corp., 214 F.3d 57, 60 (1st Cir.

2000).  The statement must be "directly tied" to the decision, Zampierollo-Rheinfeldt v. Ingersoll-

Rand de Puerto Rico, Inc., 999 F.3d 37, 52 (1st Cir. 2021), demonstrating on its face that the

decision "was reached for discriminatory reasons."   Danville v. Regional Lab Corp., 292 F.3d

1246, 1249 (10th Cir. 2002).  As such, it "proves the fact of discriminatory animus without

inference or presumption."  Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1221 (9th Cir. 1998).

Remarks by non-decisionmakers and statements by decisionmakers unrelated to the decisional

process itself "do not qualify as direct evidence."  Zampierollo-Rheinfeldt, 999 F.3d at 52.  The

remark must unambiguously display age-based animus and cannot be susceptible to benign

connotation, as "inherently ambiguous assertions normally do not constitute direct evidence of an

age-based animus." Vesprini v. Shaw Contract Flooring Services, Inc., 315 F.3d 37, 41 (1st Cir. 2002).

Turning to the record, plaintiff states that the Company had a plan to get rid of old employees because most of the work force was getting old so the Company decided to change that by hiring new people and getting rid of old people (Docket No. 180, ¶ 16). He points to comments by State Industrial's CEO, Hal Uhrman, allegedly made to Daniel Hurst sometime between 2008 and 2011, that he "didn't want old persons working for him in sales, that he wanted younger employees; and that if a person had not been successful by the age of 40 they would not become successful ever" (Docket No. 180-1, ¶¶ 25, 36).[27] Daniel Hurst worked for State Chemical as Vice President of Sales of Operations from 2008 until December of 2011 (Docket No. 161-1, ¶ 12; Docket No. 180-1, ¶ 12). Hal Uhrman stepped down as CEO in 2013 (Docket No. 161-1, ¶ 15; Docket No. 180-1, ¶ 15).[28] At the time, he was suffering from frontal lobe dementia (Docket No. 161-1, ¶ 15; Docket No. 180-1, ¶ 15). The comments presumably refer to the hiring process for when Mr. Hurst worked for Mr. Uhrman between 2008 and 2011. There is no evidence that either Hal Uhrman or Daniel Hurst was a decisionmaker with respect to anything that plaintiff is complaining about here, as the comments do not refer to the 2015 Handbook, contests, field visits or samples.

On this account, the statements attributed to Mr. Uhrman and Mr. Hurst are not direct evidence of discrimination. See, Rios-Jiménez v. Principi, 520 F.3d 31, 40 (1st Cir.

---

[27] Other comments Hurst attributes to Uhrman are that between 2008 and 2011, Uhrman instructed him to fire a 58-year-old woman that he had hired because she was too old; asked him how he dared to hire someone that old; and instructed Hurst not to promote a sales representative- Miguel González -to manager because he was too old (Docket No. 180-1, ¶ 28, ¶29, ¶ 34).

[28] Immediately thereafter, Seth Uhrman was appointed CEO of State Industrial (Docket No. 161-1, ¶ 16; Docket No. 180-1, ¶ 16).

2008)(supervisor's statements that plaintiff should not be sent termination letter because of her emotional problems not direct evidence of disability discrimination; the supervisor was not a decisionmaker); Ayala-Gerena, 95 F.3d at 96-97 (comments that the company had a black mafia which was getting rich at the expense of the organization, and that one Serrano, as a Puerto Rican, may never get another opportunity to work for a North American company if he were to be fired, not direct evidence of discrimination; speakers were not decisionmakers who made the comments in connection with the relevant decisional process); González-López, 2019 WL 8370884 at *12-13 (rejecting in Companion Case, contention that comments attributed to Hal Uhrman were direct evidence of age discrimination).[29]

Similarly, those comments were allegedly made years before the incidents under evaluation took place, which places them beyond the rubric of direct evidence.  See, Vesprini, 315 F.3d at 41-42 & n.5 (supervisor's remarks that employee would "not be [with the company] much longer," and that he should "step back and let the young stallions run the business," which were made one and a half to two years before adverse action, considered too remote to support a causal relationship between the remarks and subsequent decision-making); Birkbeck v. Marvel Lighting Corp., 30 F.3d 507, 512 (4th Cir. 1994)(discriminatory comment allegedly made over two years prior to discharge not evidence of age discrimination).

Closer in time, plaintiff refers to remarks from Paul Chatterton, Vice President of State Chemical in Puerto Rico, allegedly made during the April 2014 AST assignment meeting, that State Chemical would "bring new people, young people, new blood who are skilled in technology"

---

[29] Compare with, Dixon v. The Hallmark Companies, Inc., 627 F.3d 849, 855-856 (11th Cir. 2010)(supervisor's comments to employee on termination, "you are fired too … [y]ou 're too religious," constitutes direct evidence of religious discrimination); Early v. Champion International Corp., 907 F.2d 1077, 1081 (11th Cir. 1990)(considering management memorandum saying, "Fire Early- he is too old" –direct evidence of discrimination).

(Docket No. 180, p. 9).  Still, these statements relate to the AST assignment in 2014, a time-barred issue, and were not made in the context of the 2015 AST Handbook's rollout, field visits or contests.  Thus, they do not qualify as direct evidence of discrimination with regard to any of these claims.  See, Kirk v. Hitchcock Clinic, 261 F.3d 75, 79 (1st Cir. 2001)(pointing out that statement at issue may be direct evidence of discriminatory refusal to send plaintiff to another hospital, but that claim was time-barred); Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 36 (1st Cir. 2001)(even comments by decisionmakers have limited probative value when they are temporarily remote from the date of the employment decision or were not related to the employment decision in question).  González-López, 2019 WL 8370884 at *12-13 (concluding in Companion Case that comments attributed to Chatterton were not indicative- did not clearly state -that there was age animus in the company, and referred to the April 2014 meeting regarding implementation of the AST program, which was time-barred).

### iii.  Indirect Evidence of Discrimination

Where, as here, plaintiff has not presented direct evidence of age discrimination, the claim is analyzed using the three-stage burden shifting framework drawn from McDonnell Douglas Corp. v. Green, 411 U.S. 792, 793 (1973).  See, Vélez v. Thermo King de Puerto Rico, Inc., 585 F.3d 441, 446-447 (1st Cir. 2009)(articulating formulation).  The goal of this framework is to "progressively … sharpen the inquiry into the elusive factual questions of intentional discrimination."  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993).  Under this framework, plaintiff has the initial burden of establishing a *prima facie* case of discrimination.  See, LeBlanc v. Great American Ins. Co., 6 F.3d 836, 842-844 (1st Cir. 1993)(discussing framework).  The burden "is not onerous."  Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981).

Erazo-Vázquez v. State Industrial Products Corp., *et al.*
Civil No. 16-2709
Opinion and Order
Page 24 of 59

If a *prima facie* case is established, a rebuttable presumption of discrimination arises, switching to the employer the burden of articulating a "legitimate, nondiscriminatory reason" for the action at issue. LeBlanc, 6 F.3d at 842. This is a burden of production, not of persuasion, such that the employer is merely required to set forth through the introduction of admissible evidence, reasons for its action "which would support a finding that unlawful discrimination was not the cause of the challenged employment action." Sánchez v. Puerto Rico Oil Co., 37 F.3d 712, 720 (1st Cir. 1994). Id. An articulation not admitted into evidence "will not suffice." Burdine, 450 U.S. at 255 n.9. A defendant "cannot meet its burden merely through an answer to the complaint or by argument of counsel." Id. As a burden of production, however, this burden involves "no credibility assessment." Hicks, 509 U.S. at 509.

Should the employer satisfy this burden, the inference arising from the *prima facie* phase drops from the case. See, Domínguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 430 (1st Cir. 2000)(so noting). In that instance, the sole remaining issue "is discrimination *vel non,*" which comes front and center. Vélez, 585 F.3d at 447. To carry the devoir of persuasion on this ultimate issue, the plaintiff must identify probative evidence that the reason given by the employer for its action is pretextual, that is, not its true reason but a pretext for discrimination. Id. This step effectively "merges with the ultimate burden of persuading the court that the plaintiff has been the victim of intentional discrimination," Domínguez-Cruz, 202 F.3d at 430 (quoting Burdine, 450 U.S. at 256), a burden which remains with the plaintiff "at all times." Burdine, 450 U.S. at 253.

### a. *Prima Facie* Case

The McDonnell Douglas framework is not intended to be "rigid, mechanized, or ritualistic." U.S. Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 715 (1983). Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears

on the critical question of discrimination.  Id.  The specification of the *prima facie* proof required

in a given case "is not necessarily applicable in every respect to differing factual situations."

Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002).  Its contours "are flexible and situation-

specific."  Sánchez, 37 F.3d at 719.  With that in mind, to establish a *prima facie* case here, plaintiff

must show that: (1) he was in the protected group, that is, at least 40 years of age, when the alleged

discrimination took place; (2) he was qualified for the job benefit at issue; (3) he was subjected to

an adverse action; and (4) the employer did not treat age neutrally in taking the adverse action.

See, González-López, 2019 WL 8370884 at *13 (articulating formulation).  But he falls short.

On the assumption that what plaintiff has brought forth involves adverse actions, at the end

of the day, the 2015 Handbook change was age neutral, affecting all sales representatives without

a territory, a category that included representatives in the protected age group and outside of it;

contests were tied to new accounts and contract agreements, an age-neutral criterion; samples were

uniformly handled for sales representatives in all age brackets; and the frequency of field visits

was predicated on the need to train new employees, not on age.  See, González-López, 2019 WL

8370884 at *13 (finding 2015 Handbook and field visits age-neutral in Companion Case).  And

even though no hostile work environment or constructive discharge occurred, these items will be

discussed under separate headings below.  On this formulation, plaintiff failed to establish a *prima

facie* case of age discrimination.

**b.  Rebuttal**

Assuming, however, that plaintiff made out a *prima facie* case of age discrimination, State

Chemical rebutted it, with evidence of legitimate, nondiscriminatory grounds for its actions,

actions reasonably linked to the proper operation of the Company's business.  To this end, it points

out that the AST Program and related policies included in the 2015 Handbook would assist the

Company adapt to new purchasing trends among its clients and achieve its business goals (Docket No. 162, pp. 23-24). These would help the Company focus on accounts that purchased more than $2,500 a year in products, establish relationships with decision-makers in each client account, and secure price protection agreements with clients. See, Docket No. 162, p. 24; ¶ 18. In line with these objectives, sales representatives without a territory needed to concentrate on existing clients, generating minimum sales to prevent those accounts from falling into the open bucket.

The formula is legitimate and nondiscriminatory, as are the reasons for State Chemical's implementation of the AST Program. See, Dister v. Continental Group, Inc., 859 F.3d 1108, 1116 (2nd Cir. 1988)(corporate reorganization and concomitant change in business priorities considered both legitimate and nondiscriminatory grounds for challenged decision); Minton v. American Bankers Ins. Group, Inc., 2002 WL 1040984, *1-*2 (S.D. Fla. Apr. 24, 2002)(dismissing ADEA claim of employee laid off as a result of restructuring of sales force carried out to, among other things, address changes in industry distribution channels); Cooper v. New York State Office of Mental Health, 958 F.Supp. 87, 92 (N.D.N.Y. 1997)(employer's desire to adapt to changes in health care field is legitimate and nondiscriminatory); Nash v. Jacqueline Cochran, Inc., 548 F.Supp. 676, 677, 679-680 (S.D.N.Y. 1982)(same as to consolidation and elimination of sales territories with restructuring of sales and marketing procedures to increase efficiency and revenue); González-López, 2019 WL 8370884 at *13 (concluding in Companion Case that employer acted with a legitimate, nondiscriminatory basis in adopting the 2015 Handbook).

Likewise, contests were linked to new accounts and contract agreements. See, Docket No. 195-13, p. 12; Docket No. 182-29, p. 22. The initiative sought to reward growth in those areas rather than in traditional sales to existing clients, where the Company expected sales representatives without a territory, like plaintiff, to continue doing what they were doing before

the territory assignments.   See, Docket No. 182-9, p. 11.   The goal is legitimate and nondiscriminatory, not anchored on age.   See, Chavez v. Iberia Foods Corp., 2007 WL 1959028, *7 (E.D.N.Y. June 29, 2007)(access to new accounts legitimate, nondiscriminatory reason for employer's action).   Besides, those representatives could participate in contests, generating referral and contract-agreement business from the customers they handled.   See, Docket No. 195-13, pp. 12-15.   In this fashion, people without territories were not precluded from expanding their contract business.   Id. at p. 13.   And from March 2015, plaintiff was allowed to pursue new accounts in Vieques.   Id. at pp. 9-10, 14-15.

As for field visits, new sales representatives were required to abide by a more demanding training schedule in their first year than later in their careers.   As a result, District Managers went out with these employees more often.   See, Docket No. 161-1, ¶ 54.   In general terms, they would conduct around twelve to fourteen field visits with a new representative during his first month of employment and, thereafter, a weekly visit for the remainder of the first year.   See, Docket No. 161-1, ¶ 55.   This taxed their time, a scarce resource that needed to be allocated among competing activities.   For this reason, it is unremarkable that they concentrated their time on new employees rather than in more experienced personnel that had already been trained, and had knowledge of the Company's products and sales techniques.

Respecting samples, sales representatives had a $30.00 sample fund from which they could purchase samples.   See, Docket No. 189-1, ¶ 7.   They had the discretion to give the samples to the client or use them as part of a demonstration to the client.   Id.   If they requested samples in excess of the sample fund, the amount would be deducted from commissions in the case of representatives on straight commission or from the bonus in the case of representatives on salary.   Id. at ¶ 8.   The mechanism was age neutral.   Further, it legitimately regulated sample use, establishing a limit

beyond which the sales representative assumed the cost of the extra samples he decided to use in a particular month.  Hence, the representative needed to consider whether the potential benefit of using an extra sample outweighed its cost.  The procedure is predicated on rationality, not discrimination.

### c.  Pretext for Discrimination

As State Chemical has articulated legitimate, nondiscriminatory grounds for the challenged actions, the inquiry moves to the next stage, placing upon plaintiff the burden of showing that the employer's reasons for its decisions were pretextual and that the record would permit a reasonable jury to infer that the real reason was discriminatory animus based on his age.  In this context, pretext "means something worse than a business error."  Ronda-Pérez v. Banco Bilbao Vizcaya Argentaria-Puerto Rico, 404 F.3d 42, 45 (1st Cir. 2005).  It means deceit – a lie – a made-up story "to cover one's tracks."  Id.  Its analysis is "more demanding" than the assessment of whether a prima facie case has been established.  Mariani-Colón v. Department of Homeland Sec. ex. rel. Chertoff, 511 F.3d 216, 222 (1st Cir. 2007).  As such, it moves the inquiry to "a new level of specificity," Kosereis v. Rhode Island, 331 F.3d 207, 213 (1st Cir. 2003), directing the court's focus to the perception of the employer, to determine whether it believed that the stated reason is real.  See, Ronda-Pérez, 404 F.3d at 45 (discussing topic).

Pretext may be found where there are "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in an employer's proffered reasons for termination "that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."  Bonefont-Igaravidez v. International Shipping Corp., 659 F.3d 120, 124 (1st Cir. 2011).  But there are no such weaknesses, implausibilities, inconsistencies, or contradictions here.  There is no evidence that State

Chemical's decisions regarding the 2015 Handbook, contests, field visits, and product samples were driven by age rather than by the legitimate business objectives mentioned and analyzed earlier.

The record is devoid of proof that State Chemical invoked those objectives as an excuse to cover up discriminatory animus. The Company has been consistent in the explanation that it has presented for its actions, an element incompatible with an assertion of pretext. See, Collazo-Rosado v. University of Puerto Rico, 765 F.3d 86, 93 (1st Cir. 2014)(one way to establish pretext is to show that employer gave different and arguably inconsistent explanations for its action, unless the record conclusively reveals that the real motive was an unstated, but legitimate reason); Wierman v. Casey's General Stores, 638 F.3d 984, 995-996 (8th Cir. 2011)(discrepancy on documented reasons for plaintiff's termination immaterial where the underlying reason remains consistent).[30] As well., there is no evidence that the employer deviated without cause from its policies. See, Kouvchinov v. Parametric Technology Corp., 537 F.3d 62, 68 (1st Cir. 2008)(noting the relevance in the pretext analysis of evidence that the defendant deviated inexplicably from one of its standard business practices).

At bottom, plaintiff shows nothing for pretext, much less for pretext to cover up age animus. Bold assertions of discrimination such as he has raised are inadequate to support a finding of "proscribed discrimination." Williams v. CVS Pharmacy, Inc., 2012 WL 3150780, *17 (E.D.

---

[30] Along the same line, compare Rademacher v. HBE Corp., 645 F.3d 1005, 1007, 1011-1012 (8th Cir. 2011)(dismissing discrimination claim in part because the employer's reasons for its decision did not vary); Serrano v. Donahoe, 2014 WL 4924434, *6 (D.P.R. Sept. 30, 2014)(dismissing discrimination claim where record showed consistency in the asserted basis for the employer's decision); Taylor v. Got Beer, Inc., 2007 WL 9754086, *5 (N.D. Ala. Aug. 22, 2007)(dismissing discrimination claim where legitimate, nondiscriminatory reason articulated by employer did not change), with Vélez v. Thermo King de Puerto Rico, Inc., 585 F.3d 441, 449 (1st Cir. 2009)(finding pretext in part because the employer did not initially provide plaintiff with any reason for firing him, one month later, the company's human resource director told the EEOC and the ADU that plaintiff had been fired for violating the company's policy on receiving gifts from suppliers, and in responding to the lawsuit over a year later, the company said for the first time that plaintiff had been fired for stealing and selling company property).

Tex. Aug. 2, 2012). Proof "of more than a plaintiff's subjective belief that he was the target of unlawfulness is required to prove discrimination." Serrano, 2014 WL 4924434 at *6. A plaintiff claiming discrimination "may not prevail simply by asserting an inequity and tacking on the self-serving conclusion that the defendant was motivated by a discriminatory animus." Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 5 (1st Cir. 1998). Thus, plaintiff's disparate treatment discrimination claim under the ADEA must be dismissed. See, Wallace v. O.C. Tanner Recognition, Co., 299 F.3d 96, 101-102 (1st Cir. 2002)(summary judgment where plaintiff failed to generate genuine dispute about honesty of employer's belief); González-López, 2019 WL 8370884 at *16 (summary judgment dismissing disparate treatment claim in Companion Case).

### 3. Disparate Impact

Plaintiff alleges that he was a victim of disparate impact discrimination because nine of the ten sales representatives without a territory subject to the April 2015 compensation policy were in the protected age group (Docket No. 180, ¶ 24). Disparate impact claims "involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." Id. In this manner, a "facially neutral employment practice may be deemed illegally discriminatory without evidence of the employer's subjective intent to discriminate that is required in a disparate treatment case." Id. ad 52-53.[31]

---

[31] State Chemical objects that nowhere in the Complaint is it alleged that plaintiff was the subject of "facially neutral policies" which had a discriminatory effect on individuals over 40 (Docket No. 186, p. 7). Among other things, the Complaint states that "there was a disparate treatment based on age and/or defendants policies had a disparate impact in its application against employees in the protected age group" and "[d]efendants did this ... with the specific purpose and intention of discriminating against the [p]laintiff because of his age and force him to resign" (Docket No. 1, ¶ 26). Furthermore, it expresses that "with the clear intention of assigning [p]laintiff's client accounts to younger employees, the [d]efendants established a discriminatory policy stating that if a customer account became inactive for six (6) months of for thirty (30) days when the last sales  order had been less than $250, he would lose the account and could not contact or approach that client account anymore to attempt to make any sale" [albeit] other younger employees could validly contact [p]laintiff's accounts and take them away from him" and "[t]his was all done to force the

Erazo-Vázquez v. State Industrial Products Corp., et al.
Civil No. 16-2709
Opinion and Order
Page 31 of 59

   To establish a *prima facie* case of disparate impact discrimination, plaintiffs must show that "a specific identifiable employment practice "caused a significant disparate impact on a protected group." Ortega v. Safeway Stores, Inc., 943 F.2d 1230, 1242 (10th Cir. 1991).  In this way, the plaintiff must begin by "identifying the specific practice that is challenged." Watson, 487 U.S. at 994.[32]  Once the employment practice at issue has been identified, "plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of employees [from a benefit or opportunities] because of their membership in a protected group." Id.  To be of use, statistical analysis "must involve the appropriate comparables" and cross "a threshold of reliability before it can establish even a *prima facie* case of disparate impact." Ortega, 943 F.2d at 1243.[33]

---

[p]laintiff to resign" (Docket No. 1, ¶ 29).  A fair reading of the pleadings tends to indicate that plaintiff was only asserting a claim of deliberate discrimination, not of disparate impact, for as the Supreme Court has observed, the "necessary premise of the disparate impact approach is that some employment practices, *adopted without a deliberately discriminatory motive*, may in operation be functionally equivalent to intentional discrimination." Watson v. Fort Worth Bank and Trust, 487 U.S. 977, 987 (1988)(emphasis added).  And that is not what plaintiff has alleged but rather instances of disparate treatment, where liability depends on whether the protected trait "actually motivated the employer's decision." Raytheon Co. v. Hernández, 540 U.S. 44, 52 (2003).  On this reading, even under liberal pleading standards, there is a serious question as to whether plaintiff's pleadings gave defendants fair notice of a disparate impact claim.  Incidentally, the same objection was raised in the Companion Case- see, González-López, 2019 WL 8370884 at *10 ("Defendants aver that Plaintiff did not properly plead a disparate impact claim …") – a proposition with which the sister court agreed.  See, id. at * 11 (" … Plaintiff failed to adequately plead a disparate impact claim").  Nonetheless, for the sake of argument, the sister court assumed that the plaintiff did plead a disparate impact claim, and analyzed the claim accordingly.  Id.  The court will follow the same approach here.

[32] Congress "stripped this requirement from Title VII of the Civil Rights Act of 1964 when it amended the statute in 1991, but it remains operative under the ADEA." Karlo 849 F.3d at 70 (citing Smith v. City of Jackson, Miss., 544 U.S. 228, 240 (2005)).

[33] If the employee establishes a *prima facie* case of disparate impact age discrimination under the ADEA, the burden of production shifts to the employer to show that its neutral practice "is based on a reasonable factor other than age." Pippin v. Burlington Resources Oil and Gas Co., 440 F.3d 1186, 1200 (10th Cir. 2006).  Unlike the business necessity test under Title VII, which asks whether there are other ways for the employer to achieve its goals that do not result in a disparate impact on a protected class, the reasonableness inquiry includes no such requirement.  Id.  Instead, to prevail on an ADEA disparate impact claim, the employee must ultimately present trial-worthy evidence sufficient to persuade the factfinder that the employer's asserted basis for the neutral policy is unreasonable.  Id.  In this sense the scope of disparate-impact liability under the ADEA is narrower than under Title VII.  Id. at 1199.  Given that, as explained in the text, plaintiff fails to establish a *prima facie* case of disparate impact, there is no need to address the remaining components of the test.

In this light, the fact that a neutral policy has an adverse effect "on a single employee or even a few employees" does not by itself create a *prima facie* case of disparate discriminatory impact. Holt v. Gamewell Corp., 797 F.2d 36, 38 (1st Cir. 1986). That is so because in those cases, the relevant statistical pool is too small, and "small changes in the numbers will have a potentially huge effect on the statistical showing." Birkbeck v. Marvel Lighting Corp., 30 F.3d 507, 511 (4th Cir. 1994). Thus, small samples "have little predictive value," and "must be disregarded." Birkbeck, 30 F.3d at 511.

That is the situation plaintiff faces with the ten-employee sample he is anchoring this claim on. See, Mayor of City of Philadelphia v. Educational Equality League, 415 U.S. 605, 621 (1974)(approving of district court's concern for smallness of 13-member pool sample); Vaughan v. Metrahealth Companies, Inc., 145 F.3d 197, 203 (4th Cir. 1998)(that six of seven people discharged were over age 40 and thus age-protected under the ADEA unhelpful because a seven-employee sample is too small for reliable analysis); Fallis v. Kerr-McGee Corp., 944 F.2d 743, 746 (10th Cir. 1991)(nine-employee sample too small to provide reliable statistical results); Palmer v. U.S., 794 F.2d 534, 539 (9th Cir. 1986)(sample sizes of between seven and fifteen too small to prove discriminatory impact); Morita v. Southern California Permanente Medical Group, 541 F.2d 217, 220 (9th Cir. 1976)(sample of eight too small), *cert. denied*, 429 U.S. 1977); Harper v. Trans World Airlines, Inc., 525 F.2d 409, 412 (8th Cir. 1975)(sample of five too small); González-López, 2019 WL 8370884 at *13 (concluding in Companion Case that plaintiff's statistical evidence, the same evidence plaintiff relies on here, to wit, that nine out of the ten sales representatives who were not assigned a territory fell within the protected age group, was insufficient to establish a *prima facie* case of disparate impact). And the First Circuit sustained the sister court's finding. See, Appendix II, p. 3 ("As the district court found, there was also insufficient evidence of

Erazo-Vázquez v. State Industrial Products Corp., et al.
Civil No. 16-2709
Opinion and Order
Page 33 of 59

disparate impact"). Under these circumstances, if plaintiff's pleadings are construed to include a

disparate impact claim, he failed to establish a *prima facie* case of disparate impact discrimination.

### 4. **Retaliation**

Plaintiff alleges that he was retaliated against in violation of the ADEA for having filed a

discrimination charge against the Company and complained to his supervisors, opposing

discriminatory practices prohibited by the ADEA (Docket No. 1, ¶¶ 63-65; Docket No. 180, ¶ 39).

The ADEA contains an anti-retaliation provision, 29 U.S.C § 623(d). It covers "all employer

actions that would have been materially adverse to a reasonable employee, defined as actions that

are "harmful to the point that they could well dissuade a reasonable workers from making or

supporting a charge of discrimination." Rivera-Rivera v. Medina & Medina, 898 F.3d 77, 95 (1st

Cir. 2018). This is an objective assessment and should be judged from the perspective of a

reasonable person in the plaintiff's position, considering all the circumstances. Id. In the absence

of direct evidence of retaliation- and there is none here -courts follow the McDonnell Douglas

framework in analyzing whether retaliation claims survive summary judgment, albeit with slight

modifications to account for the claim's "distinct focus." Robinson v. Town of Marshfield, 950

F.3d 21, 29-30 (1st Cir. 2020).

Under the McDonnell Douglas framework, the first stage requires the plaintiff to make a

*prima facie* showing that (1) he engaged in ADEA-protected conduct; (ii) he was thereafter

subjected to an adverse employment action; and (iii) a causal connected existed between the

protected conduct and the adverse action. Id. Should the plaintiff make out this showing, "the

burden shifts to the defendant to, as in the discrimination context, offer a legitimate, non-retaliatory

reason for the adverse employment action." Robinson, 950 F.3d at 30. To rebut this showing, the

plaintiff must assume the further burden of showing that the proffered reason is a pretext calculated

Erazo-Vázquez v. State Industrial Products Corp., et al.
Civil No. 16-2709
Opinion and Order
Page 34 of 59

to mask retaliation.  Id.  Ultimately, plaintiff must demonstrate a genuine issue of material fact as to whether retaliation was the true motive for the adverse employment action in question.  See, Fennell v. First Step Designs, Ltd., 83 F.3d 526, 535 (1st Cir. 1996)(discussing retaliation in context of summary judgment).

Protected conduct refers "to action taken to protest or oppose statutorily prohibited discrimination."  Fantini v. Salem State College, 557 F.3d 22, 32 (1st Cir. 2009).  It includes "the filing of formal charges of discrimination" as well as "informal protests of discriminatory employment practices," such as "making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed charges."  Id.  Focusing on the actions under evaluation-field visits, contests, 2015 Handbook, and product samples - the record is insufficient to sustain a retaliation claim.[34]

First, the last time Mr. Gerfert participated in a field visit with plaintiff was November 2013, before plaintiff filed a charge of discrimination with the EEOC and ADU in January 2013. Because the event took place before he filed that claim, he cannot establish that he was retaliated against on the basis of that activity.  Collazo v. Bristol-Myers Squibb Mfg., Inc., 617 F.3d 39, 45 (1st Cir. 2010).  To rule otherwise would be to put the cart before the horse.  An employer cannot retaliate "for conduct that ha[s] yet to occur."  Pennell, 83 F.3d at 536.  See, Bonilla-Ramírez v. MVM, Inc., 904 F.3d 88, 96 (1st Cir. 2018)(("[Plaintiff] points … to [defendant's] July 10 citation

---

[34] Materially adverse actions include hostile work environments and constructive discharges.  See, Torrech-Hernández v. General Elec. Co., 519 F.3d 41, 50 (1st Cir. 2008)(pointing out that adverse employment actions comprise actual and constructive discharge); and Noviello v. City of Boston, 398 F.3d 76, 91 (1st Cir. 2005)(holding that subjecting an employee to a hostile work environment in retaliation for protected activity constitutes an adverse employment action).  These topics are analyzed under different headings below.  As explained therein, neither figure finds record support in the present case.

Erazo-Vázquez v. State Industrial Products Corp., et al.
Civil No. 16-2709
Opinion and Order
Page 35 of 59

stripping her of her security badge and reassigning her to a non-airport facility.  Notably, however, her protected decision to file her EEOC complaint occurred <u>after</u> July 10.  Thus, [defendant's] decision to strip her of her security badge and to reassign her could not have been retaliation for that protected conduct")(emphasis in original).

Second, by plaintiff's account he was unable to participate in contests when territories were assigned in April 2014; according to one of his witnesses, by that date older employees were being denied samples; and the 2015 Handbook was adopted in April 2015, events that took place more than one year after plaintiff filed the EEOC/ADU charges in January 2013.  No reasonable juror could, on this record, find causality for purposes of a *prima facie* showing.  A "gap of several months cannot alone ground an inference of a causal connection between a complaint and an alleged retaliatory action."  <u>Ahern</u> v. <u>Shinseki</u>, 629 F.3d 49, 57-58 (1st Cir. 2010).  To this end, <u>see</u>, <u>Clark County School Dist.</u> v. <u>Breeden</u>, 532 U.S. 268, 273-274 (2001)(citing with approval cases that found gaps of three and four months to be too long to establish temporal proximity); <u>Calero-Cerezo</u> v. <u>U.S. Dept. of Justice</u>, 355 F.3d 6, 25 (1st Cir. 2004) (three or four months insufficient); <u>Cosme-Pérez</u> v. <u>Municipality of Juana Díaz</u>, 110 F.Supp.3d 357, 376 (D.P.R. 2015)(five or six months insufficient); <u>Ahern</u>, 629 F.3d at 57-58 (six months insufficient); <u>Toussaint</u> v. <u>Brigham and Women's Hospital, Inc.</u>, 166 F.Supp.3d 110, 118 (D. Mass. 2015)(one-year insufficient).  For the same reason, the several-month gap here is insufficient to establish a *prima facie* case of retaliation as to these events. [35]

Third, beyond the EEOC/ADU charges, plaintiff claims that he "complained that [he] was discriminated on the basis of [his] age on several occasions… directly to Mario Carrero, Tomás

---

[35] Compare with <u>Marini-Colón</u>, 511 F.3d at 224 (temporal proximity between plaintiff's allegations of discrimination in June and termination the following August sufficient to meet burden of establishing *prima facie* case of retaliation).

Vélez, Seth Uhrman, and Jeff Geffert" (Docket No. 161-34, pp. 45-46). But he fails to allege with particularity when it was that he complained to these supervisors, a fatal flaw in the claim. See, Ríos DaSilva v. One, Inc., 980 F.Supp.2d 148, 163-164 (D.P.R. 2013)(concluding that plaintiff did not articulate sufficient facts to prove a *prima facie* case where she did not provide specific dates in order to establish temporal proximity between the protected activity and retaliatory actions); Negrón-Marty v. Wal-Mart Puerto Rico, Inc., 862 F.Supp.2d 48, 69 (D.P.R. 2012)(plaintiff did not show causal link between protected conduct and adverse actions, for he failed to match up any pair of protected activity with an adverse action, gave no indication of what two events were close in time or the dates on which any particular pair of events occurred, and in consequence did not establish the chain of causation necessary to support a *prima facie* case of retaliation); González-López, 2019 WL 8370884 at 17 (concluding that plaintiff in Companion Case failed to establish a *prima facie* case of retaliation in part because- like plaintiff here -he did not specify the times when he allegedly complained to managers, making it impossible to determine the causality between the protected conduct and the adverse actions).[36]

Fourth, these evidentiary gaps reflect absence of elements required to bring about a *prima facie* case of retaliation. But supposing plaintiff had established one here, he could not prevail, because as discussed earlier in connection with alleged discrimination, the record shows legitimate, non-retaliatory grounds for the employer's actions, which based on the record, cannot be discounted as a pretext for retaliation. See, Planadeball v. Wyndham Vacation Resorts, Inc., 793 F.3d 169, 178-179 (1st Cir. 2015)(dismissing retaliation claim of plaintiff who made out a *prima facie* case of retaliation, as supervisor's threats to fire her were made in response to her bad

---

[36] See also, Ahern, 629 F.3d at 57-58 (given that plaintiff did not specify when some actions occurred, temporal link was considered "entirely conjectural" as to those actions).

performance, occurred in the context of discussing that performance, and plaintiff could not show that the reason that motivated the supervisor was a pretext for retaliation ); Collazo-Rosado v. University of Puerto Rico, 765 F.3d 86, 93 (1st Cir. 2014)(dismissing retaliation claim where record did not show that performance and attendance issues underlying plaintiff's termination where post-hoc inventions, conjured out of thin air after the fact, to hide retaliatory animus).  In the end, plaintiff has not shown that an adverse action was taken for the purpose of retaliating against him for engaging in protected activity.

### 5.  **Hostile Work Environment**

Plaintiff alleges that he was subjected to a hostile work environment (Docket No. 180, ¶¶ 40-44).  The First Circuit has recognized "hostile work environment claims under the ADEA." Collazo v. Nicholson, 535 F.3d 41, 44 (1st Cir. 2008).  To prove a *prima facie* case of hostile work environment, a plaintiff must show that he was "subjected to severe or pervasive harassment that materially altered the conditions of [his] employment." Noviello, 398 F.3d at 92.  The harassment must be objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.  Id.

To appraise the environment, courts examine all circumstances, including "the frequency of the conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with plaintiff's work performance." O'Rourke v. City of Providence, 235 F.3d 713, 728-729 (1st Cir. 2001).  To support liability, the circumstances must reflect a workplace "permeated with discriminatory intimidation, ridicule, and insult." Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 78 (1998)(quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993)).  The employer's actions must stem from a

Erazo-Vázquez v. State Industrial Products Corp., et al.
Civil No. 16-2709
Opinion and Order
Page 38 of 59

discriminatory or retaliatory animus, "which may be factored into the hostile work environment calculus." Noviello, 398 F.3d at 93.

Plaintiff mentions a number of grievances that he believes created a hostile work environment, including that: (1) managers would not get out to the field with him; (2) he could not participate in the same contests and receive the same benefits as the newer and younger employees; (3) he could not open new accounts; and (4) plaintiff had service all of Caribbean Cinemas locations (Docket No. 180-1, ¶ 43; Docket No. 180-1, ¶ 239).[37]  He characterizes these incidents as "unwelcome harassment…sufficiently pervasive and severe as to create an abusive work environment" (Docket No. 180, ¶ 42).

Plaintiff's allegations closely track his discrimination and retaliation claims.  In this setting, courts have observed that allowing standard discrimination or retaliation claims "to be converted into a contemporaneous hostile work environment claim runs the risk of significantly blurring the distinction between the elements that underpin each cause of action and the kinds of harm each was designed to address." LaBrecque v. Mabus, 2017 WL 650060, *32 (D. Me. Feb. 16, 2017). Discrete acts constituting discrimination or retaliation claims are different in kind from a hostile work environment claim that must be based on severe or pervasive discriminatory intimidation,

---

[37] The description is taken from plaintiff's "Response in Opposition to State Chemical's Motion for Summary Judgment" (Docket No. 180) and "Statement of Additional Uncontested Material Facts" (Docket No. 181-1).  In opposing summary judgment, however, plaintiff also states, in connection with this claim, that "defendants' officials made age-related derogatory comments and that his supervisors regularly harassed him and requested him to resign" (Docket No. 180, p. 20).  The record does not support these allegations.  The court reviewed plaintiff's response to the 90 paragraphs included in State Chemical's "Statement of Uncontested Facts in Support of Motion for Summary Judgment" (Docket No. 161-1), at Docket No. 180-1, and the 254 paragraphs he included in his statement of additional uncontested material facts at Docket No. 180-1, all of the supporting exhibits he filed with his summary judgment submissions, including deposition excerpts and his 46-page "Answers and Objections to State Chemical's First Set of Interrogatories and Request for Production of Documents" (Docket No. 182-11) and nowhere does he refer in those materials to age-related derogatory comments or that plaintiff's supervisors regularly requested that he resign. "[U]nsupported allegations and speculation…do not demonstrate… the existence of a genuine issue of material fact sufficient to defeat summary judgment." Rivera-Colón v. Mills, 635 F.3d 9, 12 (1st Cir. 2011).

ridicule and insult.  See, Lester v. Natsios, 209 F.Supp.2d 11, 33 (D.C.C. 2003)(discussing topic).

If the same set of facts could support discrimination, retaliation and hostile work environment

claims, federal and state provisions that provide a separate cause of action for each of them "would

be rendered superfluous."  Gardner v. Tripp County, S.D., 66 F.Supp.2d 1094, 1100-1101 (D. S.

D. 1998).  Plaintiff cannot simply re-purpose the same discrete acts he claims are discriminatory

or retaliatory "to assert a broader hostile environment cause of action."  Williams v. Spencer, 883

F.Supp.2d 165, 180 (D.D.C. 2012)).[38]  For this reason, the court focuses on whether, "in the

aggregate," the discrete acts amount to a hostile work environment.  Bhatti v. Trustees of Boston

University, 659 F.3d 64, 74 (1st Cir. 2011); LaBrecque, 2017 WL 650060 at *32.  And the answer

is no.

Plaintiff complains about employment actions reasonably linked to legitimate business

objectives, not to instances of discriminatory intimidation, ridicule, and insult, a fatal flaw in the

claim.  See, Malone v. Lockheed Martin Corp., 610 F.3d 16, 20-22 & n.12 (1st Cir. 2010)(refusing

to find a hostile work environment in plaintiff's claims that he received a series of escalating

reprimands, deteriorating performance reviews, and eventually a demotion, as those measures

were the result of legitimate employer concerns, driven by plaintiff's absenteeism); Portugues-

Santa v. B. Fernandez Hermanos, Inc., 614 F.Supp.2d 221, 236-240 (D.P.R. 2009)(dismissing

hostile work environment claim in absence of disparate treatment, when remaining allegations

were too weak to raise a colorable claim); LaBrecque, 2017 WL 650060 at *33 (dismissing hostile

---

[38] See also, McCann v. Tillman, 526 F.3d 1370, 1379 (11th Cir. 2008)(discrete acts cannot be brought under a hostile work environment claim that centers on discriminatory intimidation, ridicule, and insult); Dávila-Feliciano v. Puerto Rico State Ins. Fund Corp., 754 F.Supp.2d 351, 365 (D.P.R. 2010)("discrete acts [are] not components of a hostile work environment"); Parker v. State of Del., Dept. of Public Safety, 11 F.Supp.2d 467, 472 (D.Del. 1998)(plaintiff cannot base hostile work environment claim on employment decisions that underpin her disparate treatment claim).

Erazo-Vázquez v. State Industrial Products Corp., et al.
Civil No. 16-2709
Opinion and Order
Page 40 of 59

work environment claim in case where plaintiff failed to establish that any of the acts he complained about were age-based or in retaliation for protected activity).

Plaintiff states that, among other things, he suffered mental anguish, emotional distress, loss of sleep, loss of appetite, and loss of the capacity to enjoy life (Docket No. 1, ¶ 50). But this is "evidence of subjective offense at best." Bhatti, 659 F.3d at 74. It does not demonstrate that the environment was objectively offensive, a critical flaw in the case, as the standard for hostile work environment includes both a subjective component and an objective component. See, Noviello, 398 F.3d at 92 (explaining standard).[39] Where the workplace "objectively falls short of the 'abusive' high-water mark, it cannot sustain a hostile work environment claim." Bhatti, 659 F.3d at 74. And that is the case here, for the employer acted with legitimate objectives, not with an age or retaliatory animus. See, González-López, 2019 WL 8370884 at *18 (concluding in Companion Case that State Chemical's assignment of territories and related policies, upon which plaintiff predicated age discrimination claim, were insufficient to show a hostile work environment). The First Circuit affirmed the sister court, "on the careful reasoning set forth in the district court's opinion." See, Appendix II, p. 2. On the same logic, plaintiff's hostile work environment claim must be dismissed.

## 6.  Constructive Discharge

Plaintiff alleges that he was forced to resign because of "discriminatory treatment and retaliatory conduct against him became so intolerable and overwhelming that his health was being affected and continues to be affected to this date," and that the resignation "constitutes a constructive discharge" in violation of the ADEA (Docket No. 1, ¶¶ 48, 49). Just as the ADEA

---

[39] See also, Hilt-Dyson v. City of Chicago, 282 F.3d 456, 463, 465-466 (7th Cir. 2002)(although employee considered incidents demeaning and degrading, conduct was not severe enough to constitute actionable harassment).

Erazo-Vázquez v. State Industrial Products Corp., et al.
Civil No. 16-2709
Opinion and Order
Page 41 of 59

bars an employer from explicitly dismissing an employee because of his age, it forbids the employer from accomplishing indirectly "what the law prohibits it from doing directly." Serrano, 2014 WL 4924434 at * 4. In consequence, it recognizes claims for constructive discharge. Id. In those instances, an employee's decision to dissociate from the employer "is assimilated to a formal discharge for remedial purposes." Pennsylvania State Police v. Suders, 542 U.S. 129, 141 (2004). Because the exterior manifestation of the termination consists of the employee's decision to sever the employment relationship, the burden of proof is on the plaintiff to show that the decision was not voluntary but that "working conditions were so difficult or unpleasant that a reasonable person in his shoes would have felt compelled to resign." De la Vega v. San Juan Star, Inc., 377 F.3d 111, 117 (1st Cir. 2004); Vega v. Kodak Caribbean, Ltd., 3 F.3d 476, 480 (1st Cir. 1993) (observing that for a resignation to be considered a constructive discharge, new working conditions must make work so "arduous," "unappealing" or "intolerable" that a reasonable person would resign).

The constructive discharge standard is objective, with the inquiry "focused on the reasonable state of mind of the putative discriminate." Greenberg v. Union Camp Corp., 48 F.3d 22, 27 (1st Cir. 1995). The employee's subjective perceptions or beliefs, however sincerely held, "do not govern." Lee-Crespo v. Schering-Plough del Caribe, Inc., 354 F.3d 34, 45 (1st Cir. 2003). Properly applied, this standard does not prevent employers from undertaking legitimate, nondiscriminatory actions. By extension, it does not guarantee a workplace free from those actions, irrespective of how unpleasant an employee may feel about them. Organizations "could not operate in the modern economy if the perquisites of every [employee's] job were frozen in time." Suárez v. Pueblo International, Inc., 229 F.3d 49, 55 (1st Cir. 2000).

With this in mind, no constructive discharge occurs where the employee's resignation is in reaction to employer actions motivated by legitimate, nondiscriminatory reasons linked to the proper operation of the employer's business.  See, Prejean v. Radiology Associates of Southwest Louisiana Inc., 342 Fed. Appx. 946, 950-952 (5th Cir. 2009)(applying proposition); Carr v. Cohen, 44 F.Supp.2d 1240, 1249 (M.D. Ala. 1999)(similar).  And as discussed above, the actions to which plaintiff attributes his resignation are just that, legitimate and nondiscriminatory, fastened to the proper operation of the employer's business.  Viewed objectively, they did not furnish, singly or in combination, a sufficient foundation for plaintiff's resignation.  See, Suárez, 229 F.3d at 54-56 (dismissing constructive discharge claim of employee who resigned because of dissatisfaction with immediate superior's decision to reconfigure the employer's operations; his perception that defendant made his working conditions intolerable by pushing him too hard; and his understanding that defendant undermined his effectiveness by excluding him from operational meetings, relocating his staff, and relegating him to developing third-party clients, as what plaintiff complained of could not have led a reasonable employee to resign); González-López, 2019 WL 8370884 at *16-17 (concluding in Companion Case that sales representative's resignation after implementation of territory assignment policies and 2015 Handbook was not a constructive discharge).

Even more, there was no hostile work environment to serve as a baseline to anchor a constructive discharge claim on.  Where a constructive discharge claim originates in a hostile work environment, it needs more than that environment to succeed.  See, Pennsylvania State Police, 542 U.S. at 133-134, 146-147 (a hostile-environment constructive discharge claim entails more than a hostile work environment).  To prove constructive discharge, the plaintiff "must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile work

Erazo-Vázquez v. State Industrial Products Corp., et al.
Civil No. 16-2709
Opinion and Order
Page 43 of 59

environment." Franceschi-Vázquez v. CVS Pharmacy, 183 F.Supp.3d 333, 343 (D.P.R. 2016)(quoting Landgraf v. USI Film Products, 968 F.2d 427, 430 (5th Cir. 1992)). And, to the extent plaintiff purports to base the constructive discharge action on a hostile work environment he cannot succeed, for he does not even meet the first element of the equation given that, as already discussed, he was not subjected to a hostile work environment. See, Cosme-Pérez v. Municipality of Juana Díaz, 110 F.Supp.3d 357, 374 (D.P.R. 2015)(dismissing constructive discharge claim where plaintiff failed to show a severe and pervasive hostile work environment that may have resulted in a protected constructive discharge); Franceschi-Vázquez, 183 F.Supp.3d at 343 (because plaintiff's working conditions were not intolerable enough to create a hostile work environment, those conditions necessarily did not reach the greater level of severity required to establish a constructive discharge claim). Under these circumstances, the constructive discharge claim under the ADEA must be dismissed.

## B. Puerto Rico Law[40]

### 1. Law 100[41]

Plaintiff alleges that the employer discriminated against him because of his age in violation of Law 100 (Docket No. 1, ¶ 61; Docket No. 180, ¶¶ 49-51). Law 100 prohibits discrimination in employment because of various characteristics, including age. See, P.R. Laws Ann. tit. 29, § 146 (setting forth prohibition). It is the "Puerto Rico equivalent of the federal ADEA, providing for civil liability in age discrimination actions." De La Vega v. San Juan Star, Inc., 377 F.3d 111, 119

---

[40] In the complaint, plaintiff presented claims under Articles 1802 and 1803 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31 §§ 5141 and 5142. He later moved to voluntarily dismiss these (Docket No. 180, ¶62).

[41] Law 100 was amended by the Labor Transformation and Flexibilization Act, Law No. 4 of January 26, 2017 ("LTFA"). The court assumes that pre-enactment law applies to Law 100 actions pending before enactment of the LTFA, such as is the case here. See, Ramos-Santiago v. WHM Carib, LLC, 919 F.3d 66, 72 n.5 (1st Cir. 2019) (deciding Law 100 dispute on same assumption).

Erazo-Vázquez v. State Industrial Products Corp., et al.
Civil No. 16-2709
Opinion and Order
Page 44 of 59

(1st Cir. 2004). It differs from the ADEA only with respect to "how the burden-shifting framework operates." Dávila v. Corporación de Puerto Rico para la Difusión Pública, 498 F.3d 9, 18 (1st Cir. 2007). On the merits, however, age discrimination claims asserted under both statutes are "coterminous." Id.

As discussed previously in connection with the ADEA, there is insufficient evidence for a reasonable fact finder to uncover any genuine issue of material fact relating to plaintiff's age discrimination claim. The record shows that the Company acted with legitimate grounds reasonably linked to the proper operation of the employer's business, not with age animus. In consequence, as with the ADEA claim, plaintiff's Law 100 claim must be dismissed. See, Velázquez-Fernández v. NCE Foods, Inc., 476 F.3d 6, 11 (1st Cir. 2007)(affirming grant of summary judgment dismissing ADEA and Law No. 100 claims for lack of evidence to support inference that employer's justification was a pretext for impermissible age discrimination); Dávila, 498 F.3d at 18 (as the employee adduced no significantly probative evidence that his discharge was motivated by age under the ADEA, the district court appropriately entered summary judgment for the employer on the Law 100 claim); De La Vega, 377 F.3d at 119 (because defendant was entitled to summary judgment on plaintiff's ADEA claim and the merits of age discrimination claims under the ADEA and Law 100 are coterminous, district court correctly entered summary judgment dismissing Law 100 claim); González-López, 2019 WL 8370884 at *19 (summary judgment dismissing in Companion Case, plaintiff's claims under ADEA and Law 100).

42

---

[42] See also, Morales-Guadalupe v. Oriental Bank and Trust, 2018 WL 1116544, *8 (D.P.R. Feb. 26, 2018)(dismissing Law 100 claim where plaintiff did not show a genuine issue of material fact as to pretext under ADEA and, thus, could not prove it as to Law 100); Ramos v. Toperbee Corporation, 241 F.Supp.3d 305, 337 (D.P.R. 2017)(having court determined that plaintiff had no valid claim under the ADEA, concluding that her claims under Law 100 could not prosper and should be dismissed); Franceschini-Vázquez, 183 F.Supp.3d at 344 (same).

Erazo-Vázquez v. State Industrial Products Corp., et al.
Civil No. 16-2709
Opinion and Order
Page 45 of 59

## 2.  Law 115

Plaintiff alleges that the employer retaliated against him in violation of Law No. 115 (Docket No. 1, ¶ 71; Docket No. 180, ¶ 38).  Law 115 makes it unlawful for an employer to discharge, threaten, or discriminate against an employee who has: (1) offered or attempted to offer testimony, expression or information before a legislative, administrative or judicial forum in Puerto Rico; and (2) provided or attempted to provide testimony, expression or information in internal procedures the company has established or before any employee or representative in a position of authority, provided the expression is not of a defamatory character or constitutes disclosure of privileged information established by law.  See, P.R. Laws Ann. tit. 29 § 194a(a) (so providing).  The second proviso was inserted in the statute by way of Law No. 169 of September 29, 2014.  Prior to the enactment, "it did not enter into the retaliation calculus under Law 115." González-Santiago v. Baxter Healthcare S.A., 2021 WL 1208207, * 39 (D.P.R. Mar. 29, 2021).

Federal courts have "consistently treated a claim under Law 115 the same as a claim pursuant to … the ADEA's retaliation provision."  Rivera-Rivera, 898 F.3d at 98.[43]  To this extent, the "analytical principles" for a Law 115 claim and an ADEA retaliation claim "are substantially the same."  Bustillo-Formoso v. Million Air San Juan Corp., 261 F.Supp.3d 201, 212 (D.P.R. 2016).  As already discussed with respect to the ADEA, the employer acted, not with retaliatory animus, but on the basis of legitimate grounds reasonably linked to the proper operation of its business.  Correspondingly, the Law 115 claim must be dismissed.  See, Arroyo-Flores v. IPR Pharmaceutical, Inc., 2017 WL 944194, * 19 (D.P.R. Mar. 9, 2017)(expressing that because

---

[43] This said, Law 115 is "not fully identical to the anti-retaliation provision[] of the …ADEA."  Rivera-Rivera, 898 F.3d at 98 n.17.  Law 115's language is more narrow, appearing to only cover "employees."  Id.  But because plaintiff was not an applicant for employment, this distinction has no bearing here.

Erazo-Vázquez v. State Industrial Products Corp., et al.
Civil No. 16-2709
Opinion and Order
Page 46 of 59

plaintiff's ADEA retaliation claim lacked merit, the Law 115 claim lacked merit as well); Figueroa v. J.C. Penney Puerto Rico, Inc., 2012 WL 4861497, *8 (D.P.R. 2010)(observing that as the parties essentially reproduced the ADEA retaliation arguments while discussing the Law 115 claim and summary judgment was entered as to the ADEA retaliation action, summary judgment was proper with respect to the Law 115 claim); Baerga-Castro v. Wyeth Pharmaceuticals, 2009 WL 2871148, * 13 (D.P.R. Sept. 3, 2009)(considering that plaintiff adduced no significantly probative evidence to prove retaliation claim under the ADEA, it was appropriate to enter summary judgment dismissing Law 115 claim on the merits as well); Bustillo-Fromoso, 261 F.Supp.3d at 212 (summary judgment disposing of the ADEA retaliation action and of the Law 115 claim); González-López, 2019 WL 8370884 at *19 (summary judgment dismissing in companion case plaintiff's retaliation claims under ADEA and Law 115).

### 3. Law 80[44]

Plaintiff alleges that his resignation should be considered a constructive discharge without just cause under Law No. 80 (Docket No. 23 ¶ 51). Law No. 80 makes private-sector employers liable for payment of an indemnity to employees hired for undefined term who are discharged without just cause. See, Article 1 of Law 80, P.R. Laws Ann. tit. 29 § 185a (stating coverage and payment obligation). The term "discharge" encompasses both actual and constructive discharge. See, Article 5 of Law 80, P.R. Laws Ann. tit. 29 § 185e (setting forth different modalities of discharge covered by statute).

---

[44] Law 80 was amended by the LTFA. The court assumes that pre-enactment law applies to Law 80 actions like the one at bar, which were pending before enactment of the LTFA. See, Martínez v. Novo Nordisk Inc., 2021 WL 1168886,*4 n.2(1st Cir. Mar. 29, 2021)(relying on pre-amendment version of Law 80); González-Santiago, 2021 WL 1208207 at 33 (deciding Law 80 dispute on assumption that pre-enactment law applies to Law 80 actions pending before enactment of LTFA).

Erazo-Vázquez v. State Industrial Products Corp., et al.
Civil No. 16-2709
Opinion and Order
Page 47 of 59

In the actual or traditional discharge, the employer unilaterally terminates the employment contract entered into with one or more employees.  See, Rivera-Figueroa v. The Fuller Brush Co., 180 D.P.R. 894 (2011), 2011 WL 833348 (P.R. Offic. Trans.), p. 5 & n. 26 (defining concept).  In the constructive or implicit discharge, the employer creates an "intimidating, hostile and offensive" work environment which leaves the employee with no reasonable alternative but to sever the employment relationship.  Rivera v. DHL Global Forwarding, 536 F.Supp.2d 148, 156 (D.P.R. 2008).

Discussing constructive discharge under Law 80, the Puerto Rico Supreme Court observed that for a constructive discharge to crop up, the employer's actions in response to which the employee leaves the job must be "arbitrary, unreasonable and capricious," and "impede a healthy work environment." Rivera-Figueroa, 2011 WL 833348 at p. 6.  Further, the Supreme Court noted that those actions must be implemented with a "motive divorced from the legitimate interest of protecting the welfare of the company." Id.  Likewise, the Court expressed that if the employer had a legitimate business reason for its actions without the intention of harming "the workers status as an employee," no constructive discharge comes about. Id.  As to how to evaluate a constructive discharge claim, the Court held that the employer's actions must be evaluated by an objective standard, not by the individual employee's subjective viewpoint. Id. at pp. 5-6.  And it pointed out that this standard determines whether a reasonable person would feel compelled to sever the employment relationship as a result of the employer's actions. Id. at p. 6.

There is no genuine issue of material fact on whether the Company acted with legitimate grounds related to the proper operation of its business.  Its actions are bereft of age or retaliatory animus.  Furthermore, plaintiff was not subjected to a hostile work environment.  Just as his resignation is not considered a constructive discharge under the ADEA, it is not a constructive

Erazo-Vázquez v. State Industrial Products Corp., et al.
Civil No. 16-2709
Opinion and Order
Page 48 of 59

discharge under Law 80.  In the absence of a discharge, the Law 80 claim must be dismissed.  See,

Rivera-Figueroa, 2011 WL 833348 (P.R. Offic. Trans.) at p. 14 (because plaintiff did not show

that the resignation was a constructive discharge, the trial court correctly dismissed his Law 80

claim); González-López, 2019 WL 8370884 at *19 (summary judgment dismissing in Companion

Case, plaintiff's constructive discharge claim under Law 80).

### 4.  Puerto Rico Constitution

Plaintiff alleges that the employer violated Sections 1, 8, and 16 of Article II of the

Constitution of Puerto Rico (Docket No. 1, ¶ 88).  As relevant, Section 1 states that the dignity of

the human being is inviolable; all men are equal before the law; no discrimination shall be made

on account of race, color, sex, birth, social origin or condition, or pollical or religious ideas; and

both the laws and the system of public education shall embody these principles of essential human

equality.  See, P.R. Laws Ann. tit. 1, Bill of Rights, Art. II, § 1.  Section 8 provides that every

person has the right to the protection of law against abusive attacks on his honor, reputation and

private or family life.  Id. at § 8.  Section 16 recognizes the right of every employee to choose his

occupation freely and to resign therefrom, and to protection against risks to his health or person in

his work or employment.  Id. at § 16.

In the setting of employment relationships, the Puerto Rico Legislature has enacted

legislation to implement the equality and non-discrimination principles embodied in Section 1, and

the safe-workplace provision set in Section 16.  As for Section 1, without being exhaustive,

relevant enactments include Law 100, P.R. Laws Ann. tit. 29 § 146 et seq., which prohibits

employment discrimination because of age; race; color; sex; sexual orientation; gender identity;

social or national origin; social condition; political affiliation; political or religious beliefs; for

being a victim or being perceived as a victim or domestic violence, sexual assault or stalking; or

Erazo-Vázquez v. State Industrial Products Corp., et al.
Civil No. 16-2709
Opinion and Order
Page 49 of 59

for being a servicemember, ex-servicemember, serving or having served in the United States Armed Forces, or holding veteran status; Law 17 of April 22, 1988, P.R. Laws Ann. tit. 29 § 155 et seq., which prohibits sexual harassment in employment; Law 69 of July 6, 1985, P.R. Laws Ann. tit. 29 § 1321 et. seq., which prohibits discrimination in employment on the basis of sex or gender; Law 44 of July 2, 1989, P.R. Laws Ann. tit. 1 § 501 et. seq., which prohibits disability discrimination; and Law 115, P.R. Laws Ann. tit. 29 P.R. § 194 et. seq., which prohibits retaliation as described earlier.[45] See, Meléndez v. Asoc. Hosp. del Maestro, 156 D.P.R. 828, 864-865 (2002)(explaining that Legislature enacted antidiscrimination statutes to implement the principle of human equality set in Section 1 of Article II of the Bill of Rights of the Constitution);[46] Soc. de Gananciales v. Centro Gráfico, 144 D.P.R. 952, 958-959 (1998)(same).  Plaintiff failed to demonstrate that the employer infringed any of these provisions.

In connection with Section 16, without being exhaustive, the Legislature enacted the Occupational Safety and Health Act, Law No. 16 of August 5, 1975, P.R. Laws Ann., tit. 29 § 361, et. seq., requiring employers to provide a workplace free of risks to the employee's health; and the Temporary Disability Benefit Act, Law 139 of June 26, 1968, P.R. Laws Ann., tit. 11 § 201 et. seq., which provides benefits to employees temporarily disabled to perform the duties of their job on account of non-occupational injury or illness.  In addition, the Legislature maintained in effect, with amendments, the pre-constitution Workers Accident Compensation Act, Law 45 of April 18,

---

[45] The Legislature also prohibited pregnancy discrimination in a pre-constitution statute, Law 3 of March 13, 1942, P.R. Laws Ann. tit. 29, § 467 et. seq., which has remained in effect after the Constitution became effective in 1952.

[46] The purpose of Section 1 is to establish as an innate foundation "the principle of dignity of human beings and as a consequence … the essential equality of all persons in our Constitutional system."  Díaz-Fontánez v. Wyndham Hotel Corp., 155 D.P.R. 364, 379 & n. 24 (2001)(citing 4 Congressional Record of the Constitutional Convention of Puerto Rico, Section 1, p. 2561 (1951)).  An English language translation of Díaz-Fontánez is included in Appendix III.

1935, P.R. Laws Ann., tit. 11§1 et. seq., which provides worker compensation benefits to employees who suffer an occupational injury or illness.  See, García v. Aljoma, 162 D.P.R. 572, 584 (2004)(noting that Law 16, Law 45 and Law 139 implement constitutional provisions embedded in Bill of Rights); Cuevas v. Ethicon Div. of J&J Prof. Co., 148 D.P.R. 839, 845 (1999)(Law 45 implements rights included in Section 16 of Article I).  Plaintiff did not show the employer violated any of these statutes.

With regard to Section 8, the Section operates "*ex proprio vigore*," such that protection against abusive attacks against a person's honor, reputation and private and family life may be enforced between private parties, not only against the State.  Rivera-Cartagena v. K-Mart Puerto Rico, Inc., 767 F.Supp.2d 310, 322 (D.P.R. 2011).  In the employment scenario, the right to privacy may be infringed when the employer places limitations on an employee's ability to make decisions about his private or family life; engages in indiscriminate dissemination of private or personal information; indiscriminately disseminates false or slanderous information; or unreasonably impinges upon the employee's personal or family tranquility.  See, Rivera-Rosa v. Citibank, N.A., 567 F.Supp.2d 289, 302 (D.P.R. 2008)(citing Segarra-Hernández v. Royal Bank de Puerto Rico, 145 D.P.R. 178, 203 (1998)).[47]  Plaintiff has not shown that the employer transgressed any of these boundaries.[48]

---

[47] English-language translation of Segarra-Hernández is included in Appendix IV.

[48] It is worth to consider the present case in light of Segarra-Hernández (Appendix IV), where the employee complained about a series of internal transfers and memoranda that she deemed offensive.  Id. at pp. 2-3, 12 (describing factual setting).  After reviewing the evidence, the Puerto Rico Supreme Court held that her treatment did not rise to the level of a constitutional violation because it did not: involve the indiscriminate dissemination of false or slanderous information; dissemination of private or personal information; limit plaintiff's faculty to make decisions about her private or family life; or unreasonably impinge on her personal or family tranquility.  Id. at p. 12.  Among other things, the memoranda looked more like legitimate actions of an employer to improve the operations of one of its departments than like abusive attacks on the personal integrity of an employee.  Id. at 13.  Further, the fact that the employee's evaluation reflected that she barely met the employer's expectations did not preclude the employer from restructuring its department and from transferring personnel in light of the institution's needs.  Id. at 14.  Similarly, the evidence

Plaintiff invokes Arroyo v. Rattan Specialties, Inc., 117 D.P.R. 35 (1986)(Docket No. 180, ¶ 60).  In Arroyo, the Puerto Rico Supreme Court held that requiring an employee- a cabinetmaker - to submit to a polygraph test violated the employee's constitutional rights to privacy, dignity and personal integrity.  Id. at 65-66.  The Supreme Court considered the characteristics of the polygraph test, the test's trustworthiness, the potential for intrusion on the employee's mind, and the employee's inability to prevent the test from registering his physiological reactions, in light of the employer's property interest, concluding that the employee's constitutional rights outweighed the employer's interest in the absence of special circumstances justifying the test such as grave danger to the social order or any other compelling state interest that could justify testing.  Id. at 61-62.  No one here, asked or required plaintiff to submit to a polygraph test as a condition of employment.

Plaintiff contends there were abusive attacks against his honor (Docket No. 180, ¶ 61).  The constitutional right to protection against abusive attacks on honor and reputation is channeled through libel and slander actions under the pre-constitution Libel and Slander Act of 1902, P.R. Laws Ann., tit. 32 § 3141 et. seq., and the general tort statute of Puerto Rico, Article 1802 of the Civil Code, P.R. Laws Ann., tit. 31 § 5141.  See, Porto y Siurano v. Bentley P.R., Inc., 132 D.P.R. 331 (1992), 1992 WL 754807 (P.R. Offic. Trans.), p. 3 (discussing topic); Pierluissi v. Coopervision Pharmaceuticals, Inc., 694 F.Supp. 1038, 1040 (D.P.R. 1988)(similar).  Libel and

---

did not reveal anything that may be regarded as insults or humiliations violating constitutional rights.  Even though on several occasions the Assistant to the Vice-president referred to plaintiff in private conversations as the fat one, the evidence showed the comments merely reflected nonprofessional and morally reprehensible conduct, not conduct that transgressed constitutionally protected limits.  Id.  This was so notwithstanding the fact that the employee developed a disabling work-related condition for which she received treatment.  Id. at 15.  However, that is not the test of constitutional infringement, as the evidence did not show that the employer's actions injured plaintiff's "constitutional right to privacy and … right to the protected against abusive attacks on her honor and personal reputation."  Id.  Overall, the employer's actions displayed "legitimate administrative functions."  Id.  Applying the same yardstick, it is apparent the present case is nowhere near the boundary beyond which liability may be imposed for infringement of plaintiff's constitutional right to privacy.

slander involve false statements.  Yet there is no evidence that the employer disseminated false information about plaintiff.

Finally, any suggestion that the employer prevented plaintiff from choosing his occupation in violation of Section 16 of the Constitution lacks record support.  Plaintiff was free to remain in the State Chemical organization or resign and pursue other endeavors in the labor market or economy at large as he saw fit.  He opted to leave the organization.  That was his choice, and he exercised it in conformity with the constitutional provision that guaranteed it.  There is no indication that the employer was a monopolist which controlled sectors of the economy or the labor market to the point of blocking plaintiff from pursuing income-generating activities, or that regardless of whether it was so, in any way interfered with plaintiff in that pursuit.  When all is said and done, plaintiff's constitutionally based claims lack merit and must be dismissed.  See, González-López, 2019 WL 8370884 at *19 (summary judgment dismissing in Companion Case, plaintiff's claims under Sections 1, 8, and 16 of Article II of the Puerto Rico Constitution).[49]

---

[49] With this disposition, there is no occasion to examine at length the interplay between all of the rights described in the Puerto Rico Constitution and their substantive implementation through legislation and the employment context in which they operate.  The interplay is of practical importance, for those rights are not absolute.  In this connection, see the discussion in the text on Law 100, Law 115 and Law 80, and to the corresponding evaluation it reflects, considering the employee's right in light of the employer's interests within the frameworks developed for that purpose.  In that same direction, courts have recognized that in Puerto Rico, employees' right to privacy must be "balanced against the legitimate interests his employer is seeking to protect."  Congreso de Uniones Industriales de Puerto Rico v Bacardi Corporation, 961 F.Supp. 338, 342 (D.P.R. 1997).  In this balance, the employer's legitimate business interests may or may not outweigh the privacy interest invoked by the employee.  Compare Rivera-Rosa, 567 F.Supp.2d at 302-303 (granting motion for summary judgment as to Puerto Rico constitutional claim under §§ 1 and 8 of Article II of the Puerto Rico Constitution in case where plaintiff was asked about her personal and family life during an investigation of which she received no advance notice; according to plaintiff, she was kept for approximately three hours in a room and "pressured" into preparing a handwritten statement before leaving the employer's premises while the employer's senior investigator for security and investigative services "walked in circles around her;" and she claimed she was "treated like a criminal suspect," as the record showed there were no demeaning statements towards her, foul language was not used, and the pressure she felt was because of the time constraints she had to prepare the statement) with Arroyo, 117 D.P.R. at 35 (requiring employee to take a polygraph test as a condition of employment in the circumstances of the case infringed employee's dignity and right to privacy) and Negrón, 212 F.3d at 666 (requiring employee, a licensed chemist, to either breach the code of ethics of her profession by altering lab results or lose her job violated employee's right to privacy).  Likewise, employer-generated communications about employees are protected by a conditional privilege such that even if it is assumed that a particular document, say a dismissal letter, has false and slanderous information and meets the element of publication, it cannot be used "as a basis for a libel

Erazo-Vázquez v. State Industrial Products Corp., et al.
Civil No. 16-2709
Opinion and Order
Page 53 of 59

## C. State Industrial's Motion for Summary Judgment

Plaintiff claims that liability may be imposed on State Industrial on the theory that he was either jointly employed by State Industrial and State Chemical or these entities were a single employer (Docket No. 1, ¶ 9; Docket No. 178, ¶ 35).[50]  State Industrial moved for summary judgment negating plaintiff's premise, instead asserting that it was not his employer (Docket No. 164, p. 2).  Plaintiff opposed the motion (Docket No. 178).  In general, a parent company is not considered the employer of its subsidiary's employees for purposes of imposing liability arising out of the employment relationship.  A certain degree of interrelation is inherent in the parent-subsidiary linkage and does not taint with liability the parent company for problems involving employees that work for the subsidiary.  But depending on the circumstances, liability may be imposed on the parent company on account of those employees.  Different theories have been developed and used to make this determination, including the joint employer and single employer doctrines that the parties have referred to.

---

action."  Acevedo v. Western Digital Caribe, Inc., 140 D.P.R. 452, 462 (1996)(English Translation included in Appendix V, quotation at p. 4).  The ruling incorporates the interests of both employers and employees, bearing in mind that as the Puerto Rico Supreme Court has observed, the employee's reputation in the workplace "may be denigrated through an intracorporate communication."  Porto y Siurano, 1992 WL 754807 (P.R. Offic. Trans.), p. 5.  At the same time, given the importance of communications about employment-related decisions to management, supervisors and staff, the employer is shielded from liability by a qualified privilege.  Id.  But the privilege is conditional, and "may be waived if abused" and therefore result in liability.  Acevedo, 140 D.P.R. at 462 (Appendix V, p. 4); García-García v. Costco Wholesale Corporation, 878 F.3d 411, 427 (1st Cir. 2017)("Because the privilege is conditional, it is lost if the employer abuses it by giving the statement excessive publicity or by publishing it for improper reasons.  The privilege also vanishes if the publication is made to one whom there is no reason to believe will protect the author's interest or the community's).  By the same token, Puerto Rico recognizes bargaining between employers and employees which place reasonable restrictions upon an employee's exercise of a gainful occupation after leaving the employer despite the constraints they may impose on the employee to engage in activities or occupations of his preference after leaving a particular job.  See, Athur Young & Co. v. Vega III, 136 D.P.R. 157 (1994), 1994 WL 909262 (P.R. Eng. 909262)(recognizing validity of noncompetition agreements subject to certain requirements, provided they protect employer's legitimate interest without imposing an undue hardship on the employee's freedom of contract and the general public's freedom of choice).  For a comprehensive discussion of some of these topics, see, Jorge L. Capó-Matos in M.J. Caterine, Employment at Will: A State-by-State Survey-Puerto Rico Chapter (2011), pp. 918-923 (defamation), and 925-926 (privacy).

[50] The plaintiff in the Companion Case made a similar argument seeking to impose liability on State Industrial as a joint employer with State Chemical.  See, González-López, 2019 WL 8370884, *20 n.31 (noting argument).

Erazo-Vázquez v. State Industrial Products Corp., et al.
Civil No. 16-2709
Opinion and Order
Page 54 of 59

The joint employer doctrine "seeks to hold an entity liable to an employee of another entity if the evidence shows that it sufficiently had power over the employee in questions."  Burnett v. Ocean Properties, Ltd., 422 F.Supp.3d 400, 415 (D. Me. 2019).  The concept recognizes that the business entities involved are in fact separate, but that they share or co-determine the conditions of employment.  Id.  Factors relevant to this inquiry include supervision of employees' day-to-day activities, authority to hire, fire, or discipline employees; authority to promulgate work rules, conditions of employment, and work assignments; participation in the collective bargaining process; ultimate power over changes in employee compensation, benefits and overtime; and authority over the number of employees.  Id. (citing in part Rivas v. Federación de Asociaciones Pecuarias de Puerto Rico, 929 F.2d 814, 820-821 (1st Cir. 1991)).

Under the single employer or integrated enterprise doctrine, "two companies may be considered so interrelated that they constitute a single employer subject to liability."  Donahue v. Clair Car Connection, Inc., 736 F.Supp.2d 294, 314 (D. Me. 2010).  Application of this doctrine entails consideration of various factors bearing on the relationship between a plaintiff's titular employer and the nominally separate entity sought to be held liable, namely: common ownership, common management, centralized control of labor relations, and interrelation of operations.  Id. Of these factors, control of employment decisions is a primary consideration in evaluating employer status.  Id.  Indeed, the First Circuit contemplates active participation in the employment process by the entity sought to be held liable under an integrated enterprise theory.  Id. at 315 (citing Romano v. U-Haul International, 233 F.3d 655, 666 (1st Cir. 2000)).

The parties quarrel as to how the evidence fits the elements that may allow State Industrial to be considered plaintiff's employer.  Among other things, they referred the court to the designation of State Industrial personnel for managerial assignments with State Chemical; State

Industrial's custody or possession of personnel files and role in securing medical and benefits providers for persons that work for State Chemical; the involvement or lack thereof of State Industrial's Human Resources Director in the decisions at issue; and the State Industrial letterhead in communications on personnel matters addressed to State Chemical employees.[51]   The court, however, will not examine the issue further.   As State Industrial adopted by reference the arguments that State Chemical asserted in its motion for summary judgment (Docket No. 164, p. 2) and those arguments lead to dismissal, the court will dismiss the case against State Industrial on that basis as well, without a determination on whether, as plaintiff claims, State Industrial was his employer.[52]

### D.   **Motion for Sanctions**

State Chemical and State Industrial request that plaintiff and his counsel be sanctioned under Rule 11 of the Federal Rules of Civil Procedure (Docket No. 199).   They point out that plaintiff denied 22 facts included in State Chemical's motion for summary judgment even though those facts are supported by plaintiff's own deposition testimony and the denials lack record support (Docket No. 199, p. 2).   Also, they indicate that plaintiff denied two of State Industrial's statement of uncontested facts related to State Chemical being a subsidiary of State Industrial, even though it was so alleged in the Complaint.   Id.   They request that those 24 facts be considered

---

[51] Plaintiff also alludes to the direct involvement of State Industrial's CEO on hiring, promotion and termination of State Chemical employees.   Still, that was from 2008 to 2011, and as such, of no import to the issue at hand, related to personnel decisions that took place between 2012 and 2015.

[52] The sister court followed the same approach in the Companion Case.   See, González-López, 2019 WL 8370884, *20 n.31 ("The Court did not enter into an analysis of whether State Industrial was a joint employer with State Chemical in the present case.   Since the claims against both are identical, and the motion for summary judgment was granted in favor of State Chemical, claims against State Industrial will also be dismissed").

admitted and that plaintiff and his counsel be required to pay for attorney's fees related to the drafting of the reply statement of facts and the motion for sanctions.  Id. at 17.[53]

Plaintiff opposes the motion, arguing that it is "nothing more than a litigation tactic" and that it should be stricken from the record (Docket No. 213, p. 2).  He claims defendants "split hairs" with plaintiff's responses in opposition to their motions for summary judgment and that from his perspective, there are "multiple issues of material fact" that prevents entry of summary judgment in this case."  Id.

Rule 11 establishes the standards attorneys and parties must meet when filing pleadings, motions, or other documents in court, as well as the circumstances in which sanctions may be imposed if the Rule's standards are not met.  To this end, it prohibits filings made with any improper purpose such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation, the offering of frivolous arguments, and the assertion of factual allegations without evidentiary support or the likely prospect of such support.  See, Fed.R.Civ.P. 11(b).  Anyone presenting a motion must certify that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the paper being filed does not violate of the Rule's prohibitions.  Id.

The purpose of Rule 11 is "to deter dilatory and abusive tactics in litigation and to streamline the litigation process by lessening frivolous claims or defenses."  Cruz v. Savage, 896 F.2d 626, 630 (1st Cir. 1990).  To achieve these goals, Rule 11 requires attorneys to take

---

[53] State Chemical and State Industrial filed a similar motion for sanctions in the Companion Case.  See, Civil Case No. 16-2710 9( GAG)(Docket No. 218).  The motion seems to have been terminated with entry of summary judgment. Nevertheless, the sister court expressed frustration with that plaintiff's response to State Chemical's statement of uncontested facts, noting that it had "burdened the Court beyond cavil."  González-López, 2019 WL 8370884, *3. This court shares the sister court's frustration.  The plaintiff in that case was represented by the same attorneys who represent plaintiff in the present case.

responsibility for the claims and defenses they represent.  Id.  They must make reasonable inquiry to assure that the claims, defenses and positions represented by them are well-grounded in both law and fact and are not intended to serve an improper purpose.  Id.  Rule 11 "is not a strict liability provision."  Méndez-Aponte v. Bonilla, 645 F.3d 60, 68 (1st Cir. 2011).  A showing of at least culpable carelessness is required before a violation of the Rule can be found.  Id.

With this in mind, the court reviewed the response to the factual statements around which this dispute revolves, and although there is some warrant for criticism, cannot say that in the context of the controversy within which they were formulated, they justify sanctions.  Some hair-splitting may have been at work in some of the statements, such as when plaintiff denied that he worked on straight commissions, the explanation for which was, that when he first started to work for the State Chemical organization he received a draw.  Along the same line, faulty legal interpretations surround other statements, as when plaintiff denied that he resigned because his separation from the Company was a constructive discharge, or that State Chemical is a subsidiary of State Industrial, the explanation provided being that based on information gathered during discovery, it was a division.  But the source for the "division" characterization was State Industrial's Human Resources Director.  Similarly, when plaintiff denied that he rejected an offer to be paid on a salary basis given that he earned more in commissions, he explained that he wanted a salary arrangement in tune with his seniority (even though that did not exist in State Chemical).[54]

---

[54] To this, a resignation is a resignation regardless of whether in may be found to have been a constructive discharge; earning more in commissions than a person would earn on salary is a fact beyond the notion that for plaintiff, the salary that the organization offered to him should have been higher; and calling a subsidiary a division does not make it so.  On this latter topic, Cf. Cyprus Amax Minerals Co., v. TCI Pacific Communications, Inc., 2015 WL 427807, *13 (N.D. Okla. Feb. 2, 2015)(concluding after evaluating evidence on various factors that subsidiaries functioned as divisions or departments of the larger entity, as a single, vertically-integrated company of it) with Katz v. Spiniello Companies, 244 F.Supp.3d 237, 254-256 (D.Mass. 2017)(subsidiary not a division or department of the parent).  For a discussion of the relationship between a parent company, a subsidiary, and affiliated entities in the context of Puerto Rico corporate law, see, Carlos E. Díaz-Olivo, Corporaciones- Tratado Sobre Derecho Corporativo, pp. 146-148 (2d Ed. 2018).

Erazo-Vázquez v. State Industrial Products Corp., et al.
Civil No. 16-2709
Opinion and Order
Page 58 of 59

On the whole, though, the court cannot say that the responses at issue crossed the threshold for sanctions under Rule 11.[55]

### E. Motion to Strike

State Chemical requests that plaintiff's sur-reply to the reply to the opposition to its motion for summary judgment be stricken because in it, plaintiff addressed legal arguments that he failed to discuss in the opposition or simply rehashed the same argument that he had already brought forth in the same (Docket No. 209, p. 1).  It mentions that in opposing summary judgment plaintiff failed the address a number of legal arguments such as time-barred claims, absence of a *prima facie* case, and constructive discharge under the ADEA; he only did it in the sur-reply; no valid reason exists for the lateness in bringing forth these arguments; by not raising them earlier, he forfeited the opportunity to do so; and thus, the arguments should be stricken.  Id. at 2.[56]

Plaintiff opposes the request, characterizing it as "ludicrous" (Docket No. 210, p. 1).  He asserts that in opposing summary judgment he properly dealt with factual issues rather than "ill construed legal arguments," and that the motion to strike is an attempt to have a "second bite at the apple," given that he sought leave to sur-reply; State Chemical opposed it basically raising the same point it raises in the motion to strike; and the court granted the leave requested despite defendant's opposition (Docket No. 210, pp. 1, 5).

Whether to allow replies and sur-replies is discretionary.  After examining the complaint (Docket No. 1), State Chemical's answer (Docket No. 13), State Industrial's motion to dismiss for failure to state a claim (Docket No. 21), the motions related to that filing (Docket Nos. 22 and 27)

---

[55] Ultimately, as discussed above, plaintiff failed to show a genuine issue of material fact precluding summary judgment.

[56] State Chemical filed a similar motion to strike the plaintiff's sur-reply in the Companion Case.  See, Civil No. 16-2710 (GAG) at Docket No. 228.  The motion seems to have been terminated with entry of summary judgment.

Erazo-Vázquez v. State Industrial Products Corp., *et al.*
Civil No. 16-2709
Opinion and Order
Page 59 of 59

and the ruling denying that motion (Docket No. 43) the court prepared and filed a Case

Management Order (Docket No. 47) that authorized replies and sur-replies.  Id. at 1-2.  Further, it

reviewed State Chemical's opposition (Docket No. 197) to plaintiff's announced intend to sur-

reply (Docket No. 196) as well as the request to sur-reply (id.) and authorized the sur-reply (Docket

No. 198).  The court was persuaded that all things considered, the information to be provided in a

sur-reply would be valuable – as it was – in the course of evaluating the motions for summary

judgment in the particular circumstances of this case.  That being so, the motion to strike cannot

be sustained.

## V.     CONCLUSION

For the reasons stated, State Chemical and State Industrial's motions for summary

judgment (Docket Nos. 161 & 163) were GRANTED, and the motion for sanctions (Docket No.

199) and to strike (Docket Nos. 208) were DENIED.  The case is hereby DISMISSED.  Judgment

will be entered accordingly.

SO ORDERED.

In San Juan, Puerto Rico, this 31st day of August, 2021.

s/Pedro A. Delgado-Hernández
PEDRO A. DELGADO-HERNÁNDEZ
U.S. DISTRICT JUDGE